**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:    Jack L. Kolpen
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ  08648-2311
(609) 896-3600
Attorneys for Plaintiff John Hoadley and Sons, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HOADLEY AND SONS, INC., on Behalf of Itself and All Others Similarly Situated, ) ) ) | Civil Action No. |
| ) | <u>CIVIL ACTION</u> |
| Plaintiff, ) | |
| ) | |
| v. ) | **Electronically Filed** |
| ) | |
| MCWANE, INC., STAR PIPE PRODUCTS, LTD., and SIGMA CORPORATION, ) ) | |
| ) | |
| Defendants. ) | |

Plaintiff John Hoadley and Sons, Inc. ("Plaintiff"), on behalf of itself and all others

similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts

pertaining to itself and upon information and belief as to all other matters, and based upon the

investigation and complaints filed by the Federal Trade Commission and the consent decree,

brings this class action for damages and other relief pursuant to the federal antitrust laws,

demands a trial by jury, and alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.      This is a proposed class action against Defendants McWane, Inc. ("McWane"),

Star Pipe Products, Ltd. ("Star"), and Sigma Corporation ("Sigma") (collectively, "Defendants")

for violations of the federal antitrust laws in the United States market for imported or domestically produced ductile iron pipe fittings ("DIPF").

2.      Beginning in January 2008, McWane, a supplier of DIPF, entered into a conspiracy with Star and Sigma, both distributors and sellers of DIPF, to raise and stabilize the prices of DIPF sold in the United States.  Defendants engaged in various collusive acts, including exchanging sales data, to facilitate price coordination and further the goals of their unlawful conspiracy.

3.      Defendants' anticompetitive conduct, however, was altered by and changed in response to the passage of the American Recovery and Reinvestment Act of 2009 ("ARRA"). ARRA, which was passed in February 2009, significantly changed the competitive dynamics of the DIPF industry in the United States.  Pursuant to ARRA, Congress allocated billions of dollars to the construction of domestic water infrastructure projects, the payment of which was expressly conditioned on the use of domestically produced materials in those projects, including domestically produced DIPF ("Domestic DIPF").

4.      At the time that ARRA was passed, McWane was the sole supplier of a full line of Domestic DIPF in the most commonly used size ranges (the "Domestic DIPF Market").  Thus, the federal stimulus money provided by ARRA left McWane as the sole supplier of a full line of Domestic DIPF and in a position to reap monopoly profits.

5.      The passage of ARRA, together with McWane's monopoly in the Domestic DIPF Market, significantly upset Defendants' ongoing collusive activities.  Specifically, in direct response to the passage of ARRA and its Buy American provision, Sigma, Star and others attempted to enter the Domestic DIPF Market in competition with McWane.

- 2 -

6.      While the passage of ARRA effectively altered the ongoing price-fixing conspiracy among Defendants in January 2009, McWane was not willing to end its anticompetitive conduct or to give up its Domestic DIPF monopoly.  In response to ARRA, McWane unlawfully and willfully maintained its monopoly in the Domestic DIPF Market via unlawful exclusionary tactics, as well as entering into a conspiracy with Sigma, as hereinafter described.

7.      McWane maintained its monopoly in the Domestic DIPF Market through exclusionary conduct, including (i) entering into a distribution agreement with Sigma that eliminated Sigma as an actual or potential entrant into the Domestic DIPF Market, and (ii) excluding actual and potential competitors, including Star, through the adoption and enforcement of exclusive dealing policies.

8.      Defendants' conduct alleged herein has unlawfully restrained competition and led to higher prices for both imported and Domestic DIPF.

9.      The Federal Trade Commission ("FTC") has launched an investigation into Defendants' practices in the DIPF Market (defined below), including the Domestic DIPF Market, resulting in the FTC's filing several administrative complaints.  As part of that government investigation, Sigma has entered into a consent decree with the FTC (the "Consent Decree"), agreeing not to engage in or continue the anticompetitive practices identified in the decree.

## JURISDICTION AND VENUE

10.     The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.  Plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

11.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.

12.     This Court also has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  There are members of the Class who are citizens of a different state than Defendants.  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which the number of members of the proposed Class is not less than 100.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

## **PARTIES**

14.     Plaintiff John Hoadley and Sons, Inc. is a Massachusetts corporation with its principal place of business located in Rockland, Massachusetts that purchased DIPF directly from one or more Defendants.

15.     McWane is a Delaware corporation with its principal place of business located in Birmingham, Alabama.  McWane manufactures, imports, markets and sells products for the waterworks industry, including DIPF.

16.     Star is a Texas limited partnership with its principal place of business located in Houston, Texas.  Star imports, markets and sells products for the waterworks industry, including DIPF.

17.     Sigma is a New Jersey corporation with its principal place of business located in Cream Ridge, New Jersey.  Sigma imports, markets and sells products for the waterworks industry, including DIPF.

## AGENTS AND CO-CONSPIRATORS

18.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

19.     Various persons or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

20.     Each Defendant acted as the principal or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## INTERSTATE TRADE AND COMMERCE

21.     Throughout the Class Periods (as defined below), Defendants manufactured, produced, sold, distributed, and/or shipped substantial quantities of DIPF in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District.  Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## RELEVANT MARKETS

22.     There are two relevant product markets:

    **(i)**    The "DIPF Market," which includes imported and domestically produced DIPF and DIPF of any size range.

    **(ii)**    The "Domestic DIPF Market", which is comprised of Domestic DIPF— domestically produced small and medium-sized DIPF.

23.    There are no close substitutes for DIPF or Domestic DIPF, and no other products significantly constrain their pricing.

24.    Before and after the passage of ARRA, some end-users purchasing DIPF for use in projects specified as domestic only were unable to substitute imported DIPF, or any other product, for Domestic DIPF.  The passage of ARRA and its Buy American requirement temporarily expanded the Domestic DIPF Market.

25.    The relevant geographic market is the United States.  To compete effectively within the United States, DIPF suppliers need distribution assets and relationships within the United States.  DIPF suppliers located outside the United States that lack such assets and relationships are unable to constrain the prices of DIPF suppliers that have such assets and relationships.

26.    Alternatively, the relevant geographic market is each and every state within the United States.  DIPF suppliers can and do engage in price discrimination based on a customer's location.  DIPF end-users require local and expeditious service and support, and typically do not purchase DIPF from waterworks distributors located more than 200 miles away.  Waterworks distributors typically do not resell DIPF to other waterworks distributors or end-users outside their service areas in any substantial quantity.

## FACTUAL BACKGROUND

## I.    The DIPF Industry

27.    DIPF are a component of pipeline systems transporting drinking and waste water under pressurized conditions in municipal distribution systems and treatment plants.  DIPF are

- 6 -

used to join pipes, valves and hydrants in straight lines, and to change, divide or direct the flow of water.  *See* Figure 1 below.



28.     DIPF are produced in a broad product line of more than 2000 unique configurations of size, shape and coating.  The industry differentiates between "A Items," which are common and used on almost every job, and "oddball" fittings that are either of unusual configuration or size, or both.  The end-users of DIPF are typically municipal and regional water authorities.

29.     Although approximately 80 percent of market demand may be serviced with a product line of 100 fittings, DIPF suppliers must be able to supply more than 1900 additional fittings to serve the remaining 20 percent of demand.

30.     Independent wholesale distributors, known as "waterworks distributors," are the primary channel of distribution of DIPF to end-users.  Waterworks distributors specialize in

- 7 -

distributing products for water infrastructure projects, and generally handle the full spectrum of waterworks products, including pipes, DIPF, valves and hydrants.  Waterworks distributors employ sales personnel dedicated to servicing the needs of end-users, and are generally able to satisfy the needs of end-users for rapid service by stocking inventory in relatively close proximity to project sites.

31.     Both imported and Domestic DIPF are commercially available.  All of the Defendants sell imported DIPF.

32.     The end-user of DIPF specifies whether, on a particular project, it will accept both imported and Domestic DIPF, or only Domestic DIPF.  This specification is often mandated by municipal code, or by state or federal law.  Before Star's entry into Domestic DIPF production in 2009, McWane was the sole producer of a full line of small and medium-sized Domestic DIPF.

33.     Domestic DIPF sold for use in projects specified as domestic only are sold at higher prices than imported or Domestic DIPF sold for use in projects not specified as domestic only.

## II.     The Relevant Markets are Conducive to Collusion

34.     The relevant markets have several features that facilitate collusion among the Defendants, including (1) product homogeneity, (2) market concentration of DIPF suppliers, (3) barriers to timely entry of new DIPF suppliers, (4) inelastic demand at competitive prices, and (5) uniform published prices.

### A.     Product Homogeneity

35.     DIPF are commodity products, which are produced to industry-wide standards. This product homogeneity enhances Defendants' ability to collude on prices and to detect deviations from those collusive prices.

LV1 1556927v1 02/02/12

B.     **Market Concentration**

36.     The relevant DIPF markets are highly concentrated.  In 2008, the Defendants collectively made more than 90 percent of sales in the relevant DIPF markets.  A highly concentrated market enhances Defendants' ability and incentive to collude on prices.

C.     **Barriers to Entry**

37.     Effective entry into the relevant DIPF markets takes several years.  Barriers to entry include the need for a new entrant to develop a distribution network and a reputation for quality and service with waterworks distributors and end-users.  Convincing end-users to allow the use of a new entrant's DIPF is often a time consuming process.

38.     In addition, end-users usually require a wide variety of DIPF, and therefore are more likely to buy from sellers who have a wide and diverse inventory.  This in turn raises the costs for a new entrant, who must build the necessary inventory to be a viable seller to end-users.

D.     **Inelasticity of Demand**

39.     If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.  Demand for DIPF is inelastic to changes in price at competitive levels.  DIPF are a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for the product.  Such a condition favors and gives greater power to the sellers, here Defendants, compared to the buyers in the market.

E.     **Uniformity of Published Prices**

40.     Defendants publish nearly identical price books listing per-unit prices for each DIPF item carried by a given supplier, and periodically publish uniform multiplier discounts at which they offer to sell DIPF on a state-by-state basis.  By simplifying and standardizing

published prices, the DIPF price list/multiplier format enhances the sellers' ability to collude on prices and to detect deviations from those collusive prices.

**III.   Defendants' Price-Fixing Conspiracy in the DIPF Market**

    **A.   Defendants Conspired to Raise and Stabilize Prices of DIPF**

41.   Due to rising input costs, Defendants all desired price increases in 2008.  Senior executives of Defendants frequently and privately communicated with one another regarding DIPF prices and output.

42.   McWane became concerned that Sigma and Star would not adhere to its announced price increases in 2008, which would result in lost sales for McWane.  Thus, Defendants worked together though 2008 to alleviate McWane's concerns, with the common purpose of gaining McWane's support for common price increases.

    **B.   The January 2008 Price Increase Was the Result of<br>a Combination and Conspiracy Among Defendants**

43.   On January 11, 2008, McWane publicly announced its first DIPF price increase of 2008.  Soon thereafter, Sigma and Star followed this price increase.

44.   Before announcing its January 2008 price increase, McWane agreed to implement higher prices only if Sigma and Star changed their business methods to reduce the risk that their local sales personnel would sell DIPF at lower-than-published prices.

45.   McWane communicated the terms of its plan to Sigma and Star, with the intent of conspiring with Sigma and Star to restrain price competition.  Sigma and Star manifested their understanding and acceptance of McWane's offer to collude by publicly taking steps to limit their discounting from published price levels to induce McWane to increase its price levels.

46.     In January 2008, Defendants announced price increases for DIPF.  On or about March 10, 2008, McWane and Sigma executives discussed by telephone their prior efforts to implement the January 2008 price increase.

**C.     The June 2008 Price Increase was the Result of
            a Combination and Conspiracy Among Defendants**

47.     On June 17, 2008, McWane publicly announced its second DIPF price increase of 2008.  Soon thereafter, Sigma and Star followed this price increase.

48.     Before announcing its June 2008 price increase, McWane agreed to implement higher pricing in exchange for information from Sigma and Star documenting the volume of their monthly sales of DIPF.  This exchange of information was to be achieved under the auspices of an entity named the Ductile Iron Fittings Research Association ("DIFRA").

49.     McWane communicated the terms of its price-increase plan to Sigma and Star, at least in part, through a public letter sent by McWane to waterworks distributors, the common customers of the Defendants.  A section of that letter was not intended for distributors, but was in fact intended to inform Sigma and Star of the terms of McWane's proposed price increases. McWane acted with the intent of conspiring with Sigma and Star to restrain price competition.

50.     Sigma and Star manifested their understanding and acceptance of McWane's offer to collude by initiating their participation in the DIFRA information exchange to induce McWane to increase its prices for DIPF.

51.     McWane, as planned by Defendants, then led a price increase, and Sigma and Star followed.

52.     On or about August 22, 2008, executives of McWane and Sigma discussed by telephone their prior efforts to implement the June 2008 price increase.

LV1 1556927v1 02/02/12

D.    **DIFRA Facilitated Price Coordination Among Defendants**

53.    The DIFRA information exchange operated as follows:  Defendants submitted a report of their previous month's sales to an accounting firm.  Shipments were reported in tons shipped, subdivided by diameter size range (*e.g.*, 2-12") and by joint type.  Data submissions were aggregated and distributed to each Defendant.  Data submitted to the accounting firm was typically no older than 45 days, and the summary reports returned to each Defendant contained data typically no more than 2 months old.

54.    During its operation between June 2008 and January 2009, the DIFRA information exchange enabled each of the Defendants to determine and to monitor its own market share and, indirectly, the output levels of its rivals.  In this way, the DIFRA information exchange facilitated price coordination among Defendants on the pricing of DIPF.  Sigma and Star stopped participating in the DIFRA information exchange in January 2009.

E.    **Defendants' Price Fixing Conspiracy Unravels**

55.    In April 2009, McWane announced a new price list for DIPF.  McWane's new published prices for medium and large diameter DIPF, the size ranges dominated by Sigma and Star, were lower than prevailing prices.

56.    Sigma and Star perceived McWane's new price list as retaliation for their failure to adhere to published price levels and for withdrawing from the DIFRA information exchange.

57.    Sigma initially resisted McWane's new price list, and proposed, in public and private communications with McWane and Star, an alternative arrangement to alleviate McWane's concerns about secret discounting.  One term of Sigma's proposal was an offer to resume participation in the DIFRA information exchange.  Another term of Sigma's proposal was that McWane would rescind its April 2009 announced price list and continue the use of the old price list in exchange for the commitment of Sigma and Star to adhere to their previously

- 12 -

published price levels for DIPF.  McWane and Star rejected Sigma's invitation to continue their

collusive arrangements.

**IV.** **McWane Willfully Monopolized and Conspired with**
**Sigma to Monopolize the Domestic DIPF Market**

**A.** **McWane Possessed Monopoly Power**

58.     At the time of the enactment of ARRA in February 2009 and thereafter, McWane

possessed monopoly power in the Domestic DIPF Market.  Indeed, at the time of the enactment

of ARRA, McWane was the only manufacturer of a full line of DIPF in the Domestic DIPF

Market and, thus, controlled nearly 100 percent of the Domestic DIPF Market as a seller.

59.     Despite Star's entry into the Domestic DIPF Market in late 2009, McWane

continues to make more than 90 percent of sales in the Domestic DIPF Market.

**B.** **Barriers to Entry**

60.     McWane's monopoly power in the Domestic DIPF Market is protected by

substantial barriers to effective entry and expansion.  As stated previously, effective entry into

the relevant DIPF markets takes several years because of the need for a new entrant to develop a

distribution network and a reputation for quality and service with waterworks distributors and

end-users.  Convincing end-users to allow the use of a new entrant's DIPF is often a time

consuming process

61.     For suppliers of Domestic DIPF that have existing relationships and goodwill

with waterworks distributors and established reputations for quality and service, McWane's

unfair and exclusionary methods of competition are the primary barriers to effective entry and

expansion in the Domestic DIPF Market.

C.    **Exclusionary Tactics**

62.    McWane's monopoly power in the Domestic DIPF Market is demonstrated by its ability to exclude competitors, to control prices, and to coercively impose unwanted distribution policies on its customers.

63.    Serampore Industries Private, Ltd. ("SIP"), another imported DIPF supplier, had an incentive to enter the Domestic DIPF Market after ARRA was passed.  Indeed, Sigma, Star and SIP all attempted to enter the Domestic DIPF Market in response to ARRA.

64.    McWane, however, was able to maintain its monopoly in the Domestic DIPF Market by illegally inducing Sigma to abandon its effort to enter the Domestic DIPF market.  It also implemented an exclusive dealing policy to prevent other competitors from entering or expanding.  Through this conduct, McWane eliminated or delayed competition from the only firms with the ability and incentive to enter the Domestic DIPF Market.  McWane acted with the specific intent to monopolize the Domestic DIPF Market.

1.    **McWane Eliminated Sigma as a Potential Entrant By Conspiring with Sigma to Monopolize the Domestic DIPF Market**

65.    After the enactment of ARRA, Sigma took steps to evaluate the desirability of entry into the Domestic DIPF Market, including but not limited to (i) formulating a complete or nearly complete operational plan, (ii) arranging for an infusion of equity capital to fund domestic production, (iii) obtaining the approval of its Board of Directors for its domestic entry plans, and (iv) casting prototype product.

66.    McWane learned that Sigma was preparing to enter the Domestic DIPF Market. In response, McWane induced Sigma to become a distributor of McWane's Domestic DIPF rather than a competitor in the Domestic DIPF Market.

- 14 -

67.     McWane and Sigma executed a Master Distribution Agreement, dated September 17, 2009 ("MDA").  The principal terms of the MDA were as follows:

(a)     McWane would sell Domestic DIPF to Sigma at a 20 percent discount off of McWane's published prices;

(b)     McWane would be Sigma's exclusive source for Domestic DIPF;

(c)     Sigma would resell McWane's Domestic DIPF at or very near McWane's published prices for Domestic DIPF; and

(d)     Sigma would resell McWane's Domestic DIPF to waterworks distributors only on the condition that the distributor agreed to purchase Domestic DIPF exclusively from McWane or Sigma.

68.     An unwritten term of the MDA was that McWane would also sell its Domestic DIPF at or very near its published prices.

69.     In the absence of the financial inducements contained in the MDA, Sigma would have entered the Domestic DIPF Market in competition with McWane.

70.     Under the MDA, McWane controlled the price at which Sigma could sell Domestic DIPF and the customers to whom Sigma could sell Domestic DIPF.  Sigma's participation in the Domestic DIPF Market under the MDA was not equivalent to, and for Plaintiff and the Classes not a substitute for, Sigma's competitive entry into the Domestic DIPF Market.

71.     Sigma's independent, competitive entry into the Domestic DIPF Market would have benefited Plaintiff and the Classes by constraining McWane's prices for Domestic DIPF.

- 15 -

72.     Through the MDA, McWane transferred a share of its sales and monopoly profits in the Domestic DIPF Market to Sigma in exchange for Sigma's commitment to abandon its plans to enter that market as an independent competitor.

73.     Both McWane and Sigma entered into the MDA with the specific intent to maintain and share in McWane's monopoly profits in the Domestic DIPF market by eliminating competition among themselves and excluding their rivals.

### 2.     McWane Excluded Star Through Exclusive Dealing

74.     Star announced its entry into the Domestic DIPF Market in June 2009.  McWane knew that, initially, Star would have a shorter product line and a smaller inventory than McWane.  Star would therefore have difficulty convincing a waterworks distributor to purchase all of its Domestic DIPF from Star.  McWane nevertheless projected that Star's entry into the Domestic DIPF Market, if unobstructed by McWane, would place downward pressure on McWane's prices for its Domestic DIPF.

75.     McWane responded to Star's entry into the Domestic DIPF Market by adopting restrictive and exclusive distribution policies.  McWane intended and expected that these policies would impede and delay the ability of Star to enter the Domestic DIPF Market and compete with McWane in that Market.

(a)     McWane threatened waterworks distributors with delayed or diminished access to McWane's Domestic DIPF, and the loss of accrued rebates on the purchase of McWane's Domestic DIPF, if those distributors purchased Domestic DIPF from Star.

(b)     As part of its MDA with McWane, Sigma agreed to implement a similar distribution policy.

(c)      McWane threatened some waterworks distributors with the loss of rebates in other product categories, such as ductile iron pipe, waterworks valves, and hydrants, if those distributors purchased Domestic DIPF from Star.

(d)      Beginning in 2011, McWane changed its rebate structure for Domestic DIPF to require waterworks distributors to make certain minimum, and high, shares of their total Domestic DIPF purchases from McWane to qualify for these rebates.

76.      The purpose and effect of McWane's exclusive dealing policies has been and is to compel the majority of waterworks distributors to deal with McWane and Sigma on an exclusive or nearly exclusive basis for their Domestic DIPF business.

77.      Due to Star's perceived or actual status as an untested supplier of Domestic DIPF with a shorter product line and smaller inventory than McWane, many distributors interested in purchasing Domestic DIPF from Star were unwilling to switch their Domestic DIPF business to Star, though they wished to purchase Domestic DIPF from both McWane/Sigma and Star, and thereby garner the benefits of price and service competition.

78.      Distributors otherwise interested in purchasing Domestic DIPF from Star were and are unwilling to do so under the terms of McWane's exclusive dealing policies, and have remained exclusive or nearly exclusive with McWane and Sigma, contrary to their preference.

79.      McWane's exclusive dealing policies have foreclosed Star from a substantial volume of sales opportunities with waterworks distributors in the Domestic DIPF Market.

80.      By foreclosing Star from a substantial volume of sales opportunities with waterworks distributors, McWane's exclusive dealing policies minimized and delayed Star's ability to compete in the Domestic DIPF Market and thereby caused Plaintiff and the members of the Classes (defined below) to pay artificially inflated prices for Domestic DIPF.

- 17 -

**D.    The Conduct of McWane and Sigma Has Enabled
        McWane to Monopolize the Domestic DIPF Market**

81.    The acts and practices of McWane and Sigma, as alleged herein, have the
purpose, capacity, tendency, and effect of (i) maintaining and stabilizing prices of Domestic
DIPF in the Domestic DIPF Market at artificially inflated levels, (ii) eliminating potential
competition from Sigma in the Domestic DIPF Market, (iii) impairing the competitive
effectiveness of Star in the Domestic DIPF Market, and (iv) raising barriers to entry for potential
rivals in the Domestic DIPF Market.

82.    There are no legitimate pro-competitive efficiencies that justify the conduct of
McWane and Sigma, or that outweigh its anticompetitive effects.

**V.    The FTC Investigates Defendants' Anti-Competitive Practices**

83.    Based on the conduct alleged herein, on January 4, 2012, the FTC filed two
separate complaints against Defendants (collectively, the "FTC Complaints"), charging that the
three companies illegally conspired to set and maintain prices for DIPF at inflated levels, and
that McWane illegally maintained its monopoly power in the Domestic DIPF Market.

84.    The FTC Complaints allege a broad range of unlawful collusive and exclusionary
conduct calculated to raise the price of DIPF, "an essential component of the nation's water
infrastructure," said Richard Feinstein, Director of the FTC's Bureau of Competition.  "The FTC
will act aggressively to protect cash-strapped municipalities and the consumers they serve from
anticompetitive conduct."

85.    On the same day, Sigma entered into a consent decree with the FTC in which it
agreed not to engage in similar anticompetitive tactics in the future.  The complaint against
McWane and Star will be heard before an administrative law judge later this year.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

86.     The effects of Defendants' anticompetitive and exclusionary acts have been to artificially raise and inflate the price of DIPF, to significantly raise barriers to entry for potential rivals, and to restrain trade in the relevant markets.

87.     The acts and practices of Defendants as alleged herein have had the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of rivals, raising rivals' costs, and deterring and impeding market entry.

88.     The effects of the anticompetitive and exclusionary acts of McWane and Sigma have been to enable McWane to capture and/or maintain a large percentage of the relevant Domestic DIPF Market, to substantially impair and foreclose competition from rivals for a substantial share of the relevant market, and to significantly raise barriers to entry for potential rivals.

89.     The unlawful conduct of McWane and Sigma has contributed significantly to the enhancement and maintenance of McWane's monopoly power in the Domestic DIPF Market.

90.     Defendants' conduct adversely affected competition and consumers by: (a) increasing or maintaining premium prices for DIPF at artificially high levels; (b) reducing the output of DIPF; (c) eliminating or significantly reducing price competition for DIPF; (d) deterring, delaying and impeding the ability of actual or potential competitors to enter or to expand their sales in the relevant markets; and (e) reducing consumer choice among competing DIPF distributors.

91.     There are no legitimate pro-competitive efficiencies that justify Defendants' conduct or outweigh its substantial anticompetitive effects.

92.     Absent Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, Defendants would have faced competition and reduced the prices they charged to purchasers of DIPF.

93.     Moreover, had actual or potential DIPF distributors not been prevented by Defendants' anticompetitive conduct from effectively competing in the market for such products, those actual or potential competitors would have sold more DIPF, gained a larger market share, and achieved economies of scale and scope that could have further driven down prices for DIPF in the marketplace.

94.     By unlawfully excluding and impairing competition, Defendants' conduct has caused Plaintiff and other members of the Classes to pay artificially higher and supra-competitive prices for DIPF than they otherwise would have paid absent Defendants' illegal, exclusionary conduct.

95.     As a result of Defendants' unlawful, anticompetitive conduct, Plaintiff and members of the Classes were compelled to pay, and did pay, artificially inflated prices for the DIPF they purchased.

96.     Plaintiff and members of the Classes have, as a consequence, sustained losses and damage to their business and property in the form of the payment of overcharges for DIPF.  The full amount of such damages will be calculated after discovery and upon proof at trial.

## FRAUDULENT CONCEALMENT

97.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct and conspiracy alleged herein prior to its public disclosure on January 4, 2012 as a result of the FTC investigation.

98.     Since the beginning of the Class Periods (defined herein), Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary

- 20 -

injury to Plaintiff and the members of the Classes.  These violations each constituted injurious acts.

99.     In addition, the illegal agreement, understanding and conspiracy of Defendants and their co-conspirators alleged herein was kept secret.  As a result, Plaintiff and the members of the Classes were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for DIPF in the United States throughout the Class Periods.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

100.     Plaintiff and the members of the Classes did not discover, nor could they have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

101.     Neither Defendants nor their co-conspirators told Plaintiff or the members of the Classes that they were fixing prices, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, the conspiracy and unlawful conduct of Defendants and their co-conspirators was inherently self-concealing.

102.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed by, *inter alia*, communicating in secret, using DIFRA to exchange information regarding sales and pricing, and sending communications in a manner or taking actions in a manner designed to hide the origin or purpose of the communication or action.

- 21 -

103.     Because the alleged conspiracy and unlawful conduct was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and the members of the Classes had no knowledge of the alleged conspiracy and unlawful conduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 2012, when reports of the FTC's investigation into anti-competitive conduct concerning DIPF were first publicly disseminated.

104.     As a result of Defendants' fraudulent concealment of their conspiracy and other unlawful conduct, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

105.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on its own behalf and as a representative of the following classes of persons and entities (the "Classes"):

**The Section 1 Class**

All persons or entities that purchased DIPF directly from any Defendant at any time between January 2008 and January 2009. Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, and government entities.

**The Section 2 Class**

All persons or entities that purchased Domestic DIPF directly from McWane or Sigma at any time between February 2009 and the date of the filing of this Complaint. Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, and government entities.

- 22 -

106.     The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of members in the Classes is unknown to Plaintiff at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least hundreds of members in the Classes and that their identities can be learned from records in Defendants' possession, custody or control.

107.     Members of the Classes are geographically dispersed throughout the United States.

108.     Plaintiff's claims are typical of the claims of the other members of the Classes.

109.     Plaintiff and the members of the Classes have all sustained damage in that, during the applicable class periods, they purchased DIPF directly from a Defendant at artificially maintained, supra-competitive prices, established by Defendants' actions in connection with the anticompetitive behavior alleged herein.  Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other members of the Classes.

110.     Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained counsel competent and experienced in class action and antitrust litigation.  Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other members of the Classes.

111.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes.

112.     The questions of law and fact common to the Classes include, but are not limited to:

(a)     whether the DIPF Market in the United States constitutes a relevant market;

(b)     whether the Domestic DIPF Market in the United States constitutes a relevant market;

(c)     whether McWane possesses monopoly power in the Domestic DIPF Market;

(d)     whether, through the conduct alleged herein, McWane willfully acquired or maintained or enhanced its monopoly power in the Domestic DIPF Market;

(e)     whether, through the conduct alleged herein, McWane and Sigma conspired to monopolize the Domestic DIPF Market;

(f)     whether McWane entered into exclusionary agreements to unlawfully acquire or maintain or enhance its monopoly power in the Domestic DIPF Market;

(g)     whether Defendants entered into exclusionary agreements to fix prices and restrain trade in the DIPF Market;

(h)     whether, and to what extent, Defendants' conduct caused Plaintiff and the members of the Classes to pay supra-competitive prices for DIPF and, thereby, suffer antitrust injuries; and

(i)     whether Plaintiff and the members of the Classes are entitled to damages and, if so, the appropriate measure of damages.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.

114.    The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and the parties, and would create a risk of inconsistent or

varying adjudications of the questions of law and fact common to the Classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  There will be no material difficulty in the management of this action as a class action on behalf of the Classes.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Price Fixing in Restraint of Trade**
**(Against All Defendants on Behalf of Section 1 Class)**

115.     Plaintiff incorporates by reference the preceding allegations.

116.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

117.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

118.     At least as early as January 2008, and continuing through at least January 2009, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize and control prices for DIPF, thereby creating anticompetitive effects.

119.     The anti-competitive acts were intentionally directed at the DIPF Market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for DIPF throughout the United States.

120.     The conspiratorial acts and combinations have caused unreasonable restraints in the DIPF Market.

- 25 -

121.    As a result of Defendants' unlawful conduct, Plaintiff and other members of the

Classes who purchased DIPF have been harmed by being forced to pay inflated, supra-

competitive prices for DIPF.

122.    In formulating and carrying out the alleged agreement, understanding and

conspiracy, Defendants and their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices and course of conduct set forth

herein.

123.    Defendants' contract, combination, and conspiracy in restraint of trade had the

following effects, among others:

(a)    Price competition in the DIPF Market has been restrained, suppressed

and/or eliminated in the United States;

(b)    Prices for DIPF sold by Defendants and their co-conspirators have been

fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the

United States; and

(c)    Plaintiff and members of the Classes who purchased DIPF from

Defendants and their co-conspirators have been deprived of the benefits of free and open

competition.

124.    Plaintiff and members of the Section 1 Class have been injured and will continue

to be injured in their business and property by paying more for DIPF purchased from Defendants

and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

125.    The alleged contract, combination, or conspiracy is a per se violation of the

federal antitrust laws.

- 26 -

126.    Plaintiff and members of the Section 1 Class are entitled to damages for the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Monopolization**
**(Against McWane on Behalf of Section 2 Class)**

127.    Plaintiff incorporates by reference the preceding allegations.

128.    McWane acquired, willfully maintained and unlawfully exercised monopoly power in the Domestic DIPF Market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to: (1) eliminating Sigma as a potential entrant through exclusionary tactics; (2) foreclosing Star from effectively competing in the Domestic DIPF Market through exclusive dealings and business practices with McWane's existing customers; and (3) entering into an MDA with Sigma with the specific intent to monopolize the relevant Domestic DIPF Market,.

129.    McWane has effectively excluded competition from a significant portion of the Domestic DIPF Market, unlawfully acquired and expanded its dominant market share in the Domestic DIPF Market, and profited from its anticompetitive conduct by maintaining prices at artificially high levels and by otherwise reaping the benefits of its illegally obtained and maintained monopoly power in that Market.

130.    There is no legitimate business justification for McWane's anticompetitive actions and the conduct through which it acquired and maintained its monopoly power in the Domestic DIPF Market.  The anticompetitive effects of McWane's conduct far outweigh any conceivable pro-competitive benefit or justification.  Even if such justification had existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

131.     As a direct and proximate result of McWane's anticompetitive conduct, Plaintiff and members of the Section 2 Class have been injured in their business or property by McWane's unlawful monopolization of the relevant market.  Plaintiff and the other members of the Section 2 Class have been forced to pay artificially high, supra-competitive prices for Domestic DIPF, prices higher than they would have paid absent McWane's unlawful monopolization of the Domestic DIPF Market.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Conspiracy to Monopolize**
**(Against McWane and Sigma on Behalf of Section 2 Class)**

132.     Plaintiff incorporates by reference the preceding allegations.

133.     McWane and Sigma conspired to acquire, willfully maintain and unlawfully exercise monopoly power in the Domestic DIPF Market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to: (1) eliminating Sigma as a potential market entrant through exclusionary tactics; (2) foreclosing Star from effectively competing in the Domestic DIPF Market through exclusive dealing contracts and other coercive business practices with McWane's existing customers; and (3) entering into an MDA with the specific intent to monopolize the Domestic DIPF Market,.

134.     As a result of the conspiracy, McWane and Sigma have effectively excluded competition from a significant portion of the Domestic DIPF Market, unlawfully acquired and expanded McWane's dominant market share in the Domestic DIPF Market, and profited from their anticompetitive conduct by maintaining prices at artificially high levels and by otherwise reaping the benefits of their illegally obtained and maintained monopoly power.

135.     There is no legitimate business justification for the anticompetitive actions of McWane and Sigma and the conduct through which they acquired and maintained monopoly

power in the Domestic DIPF Market. The anticompetitive effects of the conduct of McWane and

Sigma far outweigh any conceivable pro-competitive benefit or justification. Even if such

justification had existed, any possible pro-competitive benefits could have been obtained by less

restrictive alternatives.

136.     As a direct and proximate result of the anticompetitive conduct of McWane and

Sigma, Plaintiff and members of the Section 2 Class have been injured in their business or

property by the unlawful monopolization of the relevant market. Plaintiff and the other members

of the Section 2 Class have been forced to pay artificially high, supra-competitive prices for

Domestic DIPF, prices higher than they would have paid absent the unlawful monopolization of

the Domestic DIPF Market.

**RELIEF REQUESTED**

Accordingly, Plaintiff and the Classes respectfully request the following relief:

(a)     Certification of the Classes defined in this Complaint pursuant to Federal

Rule of Civil Procedure 23(a) and (b)(3), and designating Plaintiff as the representative for the

Classes and its counsel as counsel for the Classes;

(b)     Defendants' actions described herein be adjudged and decreed to be in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)     The actions of Defendants described herein be adjudged and decreed to be

in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(d)     Plaintiff and the Classes recover damages, as provided by law, that they

are determined to have sustained, and that judgment in favor of Plaintiff and the Classes be

entered against Defendants, together with prejudgment interest at the maximum rate allowable

by law;

LV1 1556927v1 02/02/12

       (e)     Plaintiff and the Classes recover the costs of this suit, including reasonable attorneys' fees, as provided by law; and

       (f)     Plaintiff and the Classes be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

Respectfully submitted,

Dated:  February 2, 2012

FOX ROTHSCHILD LLP
*Attorneys For Plaintiff And The Proposed Classes*

By: /s/ Jack L. Kolpen
      JACK L. KOLPEN

Of Counsel:

Hollis L. Salzman
Bernard Persky (to be admitted *pro hac vice*)
Kellie Lerner
Amy Garzon (to be admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile: (212) 818-0477
hsalzman@labaton.com
bpersky@labaton.com
klerner@labaton.com
agarzon@labaton.com

Michael P. Thornton (to be admitted *pro hac vice*)
Garrett J. Bradley (to be admitted *pro hac vice*)
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Telephone:  (888) 491-9726
mthornton@tenlaw.com
gbradley@tenlaw.com

Mark S. Shane
Kenneth A. White
SHANE AND WHITE, LLC
1676 Route 27
Edison, NJ 08817
Telephone: (732) 819-9100
Facsimile: (732) 572-9641
mshane@shaneandwhite.com
kwhite@shaneandwhite.com

LV1 1556927v1 02/02/12