LITE DePALMA GREENBERG, LLC
Allyn Z. Lite
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel: 973.623.3000
*Interim Co-Liaison Counsel*

STERNS & WEINROTH, PC
Karen A. Confoy, Esq.
50 W. State St., Suite 1400
Trenton, NJ 08608
Tel: 609.392.2100
*Interim Co-Liaison Counsel*

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

IN RE DUCTILE IRON PIPE FITTINGS
("DIPF") DIRECT PURCHASER
ANTITRUST LITIGATION

Civ. No. 12-711 (AET)(LHG)

## CONSOLIDATED AMENDED COMPLAINT AND
## DEMAND FOR TRIAL BY JURY

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as

defined below), upon personal knowledge as to the facts pertaining to themselves and upon

information and belief as to all other matters, and based upon the investigation and complaints

filed by the Federal Trade Commission ("FTC") and the consent decrees, bring this class action

for damages and other relief pursuant to the federal antitrust laws, and demand a trial by jury.

## DEFINITIONS

1.      Ductile iron pipe ("DIP"):  Pipes made of a cast ferrous material in which a major

part of the carbon content occurs as a free graphite in a substantially nodular or spheroidal form.

Developed in 1948, ductile iron improved upon the strength and ductility of gray cast-iron,

which it has replaced in the marketplace as a pipe material.  Ductile iron is considered a virtually

maintenance-free underground pressure pipe material, and is used in the transportation of raw

and potable water, sewage, slurries, and process chemicals.

2.      Ductile iron pipe fittings ("DIPF"):  A ductile iron pipe fitting is used to join DIPs, valves and hydrants within the water systems, as well as to change, divide or direct the flow of water.  DIPF exist in a wide variety of available configurations including but not limited to bends, tees, crosses, reducers, caps, plugs, and sleeves, and include the nuts, bolts, gaskets and glands specifically sold for use with DIPF.

3.      Domestic DIPF:  DIPF that is produced in the United States.

4.      The DIPF Market:  The United States market for DIPF, whether domestically produced or imported.

5.      The Domestic DIPF Market: The United States market for DIPF that is produced in the United States.

## NATURE OF THE ACTION

6.      This is a proposed class action against Defendants McWane, Inc., and its owned divisions Clow Water Systems Co., Tyler Pipe Company, and Tyler Union (collectively, "McWane"), Sigma Corporation and its owned subsidiary Sigma Piping Products Corporation (collectively, "Sigma"), and Star Pipe Products, Ltd. ("Star") (collectively, "Defendants") for violations of the federal antitrust laws in the DIPF Market.

7.      This case alleges two unlawful conspiracies by the Defendants: the first among all Defendants to fix, raise, maintain and stabilize prices for DIPF that they sold directly to Plaintiffs and other class members which began at least as early as January 2008 and continued through at least May 2009, and the second between Defendants McWane and Sigma to monopolize and unreasonably restrain trade and fix prices in the Domestic DIPF Market, which began as early as September 17, 2009 and continued until at least January 3, 2012.  Plaintiffs also allege that Defendant McWane monopolized the Domestic DIPF Market from as early as February 17, 2009

through the present.  As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes defined below have paid supra-competitive, artificially inflated prices for DIPF and thus suffered injury of the type the federal antitrust laws are designed to prevent.

8.      During the relevant period, Defendants have been the primary sellers, importers, and manufacturers of DIPF in the United States.  DIPF are an integral part of municipal and regional water systems throughout the United States that transport drinking and waste water under pressurized conditions.

9.      Beginning at least as early as January 2008, McWane, a manufacturer and seller of DIPF, entered into a conspiracy with Star and Sigma to fix, raise, maintain and stabilize the prices of DIPF sold in the United States.  Defendants engaged in various collusive acts, including agreements on DIPF price levels and the exchange of sales data, to facilitate price increases and further the goals of their unlawful conspiracy.

10.     As part of the American Recovery and Reinvestment Act of 2009 ("ARRA"), which was enacted in February 2009, Congress allocated billions of dollars to fund the construction of domestic water infrastructure projects using domestically produced materials, including Domestic DIPF.

11.     At the time ARRA was passed, McWane was the sole U.S. supplier of a full line of Domestic DIPF in the most commonly used size ranges. The passage of ARRA left McWane, as the sole supplier of a full line of Domestic DIPF, in a position to reap monopoly profits.

12.     Incentivized by the passage of ARRA and its "Buy American" provision, Sigma and Star began to undertake efforts to enter the Domestic DIPF Market in competition with McWane.

13.     In response, McWane intentionally took steps to maintain its monopoly power in the Domestic DIPF Market via unlawful, anticompetitive, exclusionary tactics, including but not limited to: (i) entering into a distribution agreement with Sigma that eliminated Sigma as an actual or potential entrant into and competitor in the Domestic DIPF Market, and (ii) adopting and enforcing exclusive dealing and rebate policies that had the intended effect of excluding and impeding the entry of actual and potential competitors, including Star, into the Domestic DIPF Market.

14.     McWane's tactics were successful and it maintained its control over 90% of the Domestic DIPF Market, even after Star's entry into that market in 2009.

15.     Defendants' conduct alleged herein has unlawfully and unreasonably restrained competition and led to higher, artificially inflated prices for both imported and Domestic DIPF.

16.     The FTC has launched an investigation into Defendants' practices in the DIPF Market, including the Domestic DIPF Market, resulting in the FTC's filing of administrative complaints against McWane, Star and Sigma.  Both Sigma and Star have entered into consent decrees with the FTC (the "Consent Decrees"), agreeing not to engage in or continue the anticompetitive conduct identified in the decrees.

17.     Plaintiffs bring this action on behalf of themselves and three classes: (i) direct purchasers of DIPF (whether imported or domestic) in the United States from one or more of the Defendants from January 11, 2008 through May 31, 2009 ("Class Period I"); (ii) direct purchasers of Domestic DIPF in the United States from McWane from February 17, 2009 through the present ("Class Period II"); and (iii) direct purchasers of Domestic DIPF in the United States from McWane and Sigma from September 17, 2009 through January 3, 2012 ("Class Period III").

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiffs and the other members of the Classes have suffered from Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, in that this action arises under the federal antitrust laws.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, because, during the class periods, Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

21.     This Court has personal jurisdiction over each Defendant because each Defendant (a) transacted business throughout the United States, including in this District; (b) sold DIPF throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) committed one or more overt acts in furtherance of their illegal scheme and price-fixing and monopolistic conspiracies in the United States.  In addition, the conspiracies and monopolization alleged below were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**PARTIES**

22.     Plaintiff City and County of Denver ("Denver") is a municipal corporation of the State of Colorado.  Denver, acting by and through its Board of Water Commissioners, purchased DIPF directly from Star during the Class Periods, pursuant to a three-year contract.

23.     Plaintiff Coastal Plumbing Supply Company Inc. ("Coastal") is a New York corporation with its principal place of business in Staten Island, New York.  Coastal Plumbing Supply Company Inc. purchased imported DIPF directly from Sigma during the Class Periods.

24.     Plaintiff GCO, Inc. f/k/a Groeniger & Co. ("GCO") is a California corporation with its principal place of business located in Hayward, California.  GCO purchased DIPF directly from McWane, Sigma, and Star during Class Period I; domestic DIPF directly from McWane during Class Period II; and domestic DIPF directly from McWane and Sigma during Class Period III.

25.     Plaintiff HI Line Supply Co. Ltd.("HI Line") is an Illinois corporation with its principal place of business in Peoria, Illinois.  HI Line purchased domestic and imported DIPF directly from McWane during the Class Periods.

26.     Plaintiff John Hoadley and Sons, Inc. ("Hoadley") is a Massachusetts corporation with its principal place of business located in Rockland, Massachusetts.  Hoadley purchased domestic and imported DIPF directly from McWane during the Class Periods.

27.     Plaintiff Mountain States Supply, LLC ("Mountain States") is a Utah limited liability company with its principal place of business located in Salt Lake City, Utah.  Mountain States purchased domestic DIPF directly from McWane, and imported DIPF directly from McWane and Star during the Class Periods.

28.     Plaintiff Mountainland Supply, LLC ("Mountainland Supply") is a Utah limited liability company with its principal place of business located in Orem, Utah.  Mountainland Supply purchased domestic DIPF directly from McWane, and imported DIPF directly from McWane and Star, during the Class Periods.

29.     Plaintiff Public Works Supply Co., Inc. ("Public Works") is a Massachusetts corporation whose principal place of business was located in Danvers, Massachusetts.  Public Works purchased domestic and imported DIPF directly from Star between January 11, 2008 and April 3, 2009.

30.     The plaintiffs named in paragraphs 22-29 above are collectively referred to as "Plaintiffs."

31.     Defendant McWane, Inc. is a Delaware corporation with its principal place of business located in Birmingham, Alabama. At all relevant times Defendant Clow Water Systems Co. ("Clow"), located in Coshocton, Ohio, has been a division of and owned and controlled by McWane, Inc.  At all relevant times, Defendant Tyler Pipe Company ("Tyler Pipe"), located in Tyler, Texas, has been a division of and owned and controlled by McWane, Inc.  At all relevant times Defendant Tyler Union (f/k/a Union Foundry Company) ("Tyler Union"), located in Anniston, Alabama, has been a division of and owned and controlled by McWane, Inc.  During the relevant period, McWane, Inc., directly or through its divisions Clow, Tyler Pipe and Tyler Union (collectively "McWane"), manufactured, imported, marketed and sold products, including DIPF, for the waterworks industry in the United States.  At all relevant times Clow, Tyler Pipe and Tyler Union were controlled by, and priced, sold and marketed DIPF pursuant to policies and practices established by McWane, Inc.

32.     Defendant Sigma Corporation is a New Jersey Corporation with its principal place of business located in Cream Ridge, New Jersey.  At all relevant times, Defendant Sigma Piping Products Corporation ("SPPC") has been a subsidiary of and owned and controlled by Sigma Corporation.  During the relevant period Sigma Corporation, directly or through its subsidiary SPPC (collectively "Sigma") imported, marketed and sold products, including DIPF, for the waterworks industry in the United States.  At all relevant times, SPPC was controlled by, and priced, sold and marketed DIPF pursuant to practices and policies established by Sigma Corporation.

33.     Defendant Star Pipe Products, Ltd. ("Star") is a Texas limited partnership with its principal place of business located in Houston, Texas.  During the relevant period, Star imported, marketed, and sold products, including DIPF, for the waterworks industry in the United States.

34.     The defendants named in paragraphs 31-33 above are referred to collectively as "Defendants."

### AGENTS AND CO-CONSPIRATORS

35.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

36.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.

37.     Each Defendant acted as the principal or agent for other participants in the conspiracies alleged herein in which they participated.

**INTERSTATE TRADE AND COMMERCE**

38.     Throughout the Class Periods, Defendants manufactured, produced, sold, distributed, and shipped substantial quantities of DIPF in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including into, through and within this District.

39.     The conspiracies in which Defendants participated, and Defendant McWane's monopolization, as described herein, had a direct and substantial effect on interstate trade and commerce.

**FACTUAL BACKGROUND**

I.     **The DIPF Industry**

40.     Since its introduction, ductile iron pipe has been recognized as the industry standard for modern water and wastewater systems.  Due to its high strength, durability, impact and corrosion resistance, and reliability for transporting raw and potable water, as well as waste water and sewage, ductile iron pipe has virtually replaced gray cast iron pipe, its predecessor, which has been in use in municipal and other water systems in the United States since 1817. Ductile iron pipe is manufactured to exacting national standards set by the American National Standards Institute/American Waste Water Association Committee A21, known as standards ANSI/AWWA C110/A21.10 and C153/A21.53.  Ductile iron pipe, which comes in a variety of sizes, is particularly well-suited for high-pressurized water systems, and can be installed in trenches or above-the-ground without losing strength and durability.  Ductile iron pipe is far superior to other kinds of pipe (e.g. gray cast iron or PVC) for the uses to which it has been designed and applied.

41.     DIPF are components of pipeline systems transporting drinking and waste water under pressurized conditions in municipal distribution systems and treatment plants. DIPF are used to join pipes, valves and hydrants in straight lines, and to change, divide or direct the flow of water.  Non-ductile iron pipe fittings are not suitable for these purposes in ductile iron pipe systems.

42.     DIPF are produced in a broad product line of configurations of sizes, shapes and coatings. The end-users of DIPF include municipal and regional water authorities. Approximately 80 percent of market demand for DIPF may be serviced with a product line of 100 fittings.

43.     Independent wholesale distributors, known as "waterworks distributors," are the primary channel of distribution of DIPF to end users.  They purchase DIPF directly from Defendants.  Waterworks distributors specialize in distributing products for water infrastructure projects, and generally handle the full spectrum of waterworks products, including pipes, DIPF, valves and hydrants.  Some municipal and regional water authorities also purchase DIPF directly from Defendants.

**II.    DIPF Markets**

44.     DIPF are either manufactured domestically or imported.  All Defendants sell imported DIPF.

45.     Each water infrastructure project has a specification stating whether both imported and Domestic DIPF, or only Domestic DIPF is acceptable.  This specification is often mandated by municipal code, or by state or federal law (such as ARRA).  Accordingly, projects specified as "domestic only" generally cannot substitute imported DIPF for Domestic DIPF.

46.     The enactment of ARRA in 2009 expanded the market for Domestic DIPF because its "Buy American" provision required certain public works projects to use only iron, steel, and manufactured goods that were produced in the United States.

47.     There are two DIPF product markets in the United States:  DIPF for projects not specified as "domestic only" and DIPF for projects specified as "domestic only."  The DIPF Market and the Domestic DIPF Market are sometimes referred to herein as the "DIPF Markets."

48.     There are no widely used substitutes for DIPF, and no other product significantly constrains the prices of DIPF.  Therefore, the DIPF Markets constitute economically appropriate product markets for the purposes of antitrust analysis under Section 2 of the Sherman Act.  The DIPF Markets are highly concentrated.  For example, in 2008, more than 90 percent of sales within the DIPF Markets were made by the Defendants.

49.     The relevant DIPF geographic market is the United States.  DIPF suppliers located outside the United States lack the distribution, assets and business relationships necessary to constrain the prices of DIPF suppliers located in the United States.

## III.    Defendants' Price-Fixing Conspiracy

### A.    Defendants Conspired to Fix, Raise, Maintain and Stabilize Prices of DIPF

50.     Beginning at least as early as January 2008 and continuing at least until May 2009, Defendants agreed and conspired to fix, raise, maintain and stabilize, and did in fact fix, raise, maintain and stabilize, the prices at which DIPF (imported and domestic) were sold in the United States.

51.     Although the Defendants were secretly conspiring to set prices, purchases by Plaintiffs and members of the Classes involved separate and distinct transactions with McWane, Sigma and Star.  For example, purchasers buying DIPF from Sigma and Star had no rights,

benefits or obligations from McWane in connection with those purchases.  Similarly, in connection with those transactions, Sigma and Star had no obligations or rights in connection with McWane's separate sales of DIPF (or any agreements related to those sales), and received no benefits from those transactions.  Purchases from McWane were separate and distinct in the same manner.  Notwithstanding the separate nature of these purchases and transactions, McWane, Sigma and Star were able to restrain competition and charge supracompetitive prices through the actions set forth below.

**B.**     **The January 2008 Price Increase**

52.     Defendants all desired to increase prices in 2008. Senior executives of Defendants frequently and privately communicated with one another regarding DIPF prices and output, and the increase of DIPF prices.  Defendants arranged and agreed upon a system by which they would all accomplish price increases through the use of seemingly unilaterally announced price increases.  The Defendants agreed that if one of them announced a price increase on DIPF, then the other Defendants would subsequently also announce a similar increase in their prices.

53.     McWane, however, was concerned that Sigma and Star would not adhere to McWane's announced price increases, which would result in lost sales for McWane.  Thus, Defendants worked together through 2008 to alleviate McWane's concerns, with the common purpose of gaining all Defendants' support for collective price increases.

54.     On January 11, 2008, McWane publicly announced its first DIPF price increase of 2008.  Soon thereafter, Sigma and Star, pursuant to Defendants' agreement, announced similar price increases.

55.     Before announcing its January 2008 price increase, McWane agreed to implement higher prices only if Sigma and Star changed their business methods to reduce the risk that their local sales personnel would sell DIPF at lower-than-published prices.

56.     McWane communicated the terms of its plan to Sigma and Star, with the intent of conspiring with Sigma and Star to restrain price competition.  Sigma and Star communicated their understanding and acceptance of McWane's offer to collude by publicly taking steps to limit their discounting from published price levels to induce McWane to increase its price levels.

57.     On or about March 10, 2008, McWane and Sigma executives acted in furtherance of the conspiracy by discussing by telephone their efforts to implement the January 2008 price increase.

**C.     The June 2008 Price Increase**

58.     On June 17, 2008, McWane publicly announced its second DIPF price increase of 2008.  Soon thereafter, pursuant to Defendants' agreement, Sigma and Star also announced similar price increases.

59.     Before announcing its June 2008 price increase, McWane agreed to implement higher pricing in exchange for information from Sigma and Star documenting the volume of their monthly sales of DIPF.  This exchange of information was achieved under the auspices of an entity named the Ductile Iron Fittings Research Association ("DIFRA").

60.     In addition to conversations among McWane, Sigma and Star, McWane communicated the terms of its price-increase plan to Sigma and Star, at least in part, through a public letter sent by McWane to waterworks distributors, the common customers of the Defendants.  A section of that letter was not intended for and had no relevance to waterworks distributors, but was in fact intended to inform Sigma and Star of the terms of McWane's

proposed price increases.  McWane acted with the intent of conspiring with Sigma and Star to unreasonably restrain price competition.

61.    Sigma and Star communicated their understanding and acceptance of McWane's offer to collude by, among other things, initiating in June 2008 their participation in the DIFRA information exchange to induce McWane to increase its prices for DIPF.

62.    McWane then announced a price increase, and Sigma and Star announced similar increases, as previously agreed by Defendants.

63.    On or about August 22, 2008, executives of McWane and Sigma acted in furtherance of the conspiracy by discussing by telephone their efforts to implement the June 2008 price increase.

**D.    DIFRA Facilitated Price Coordination Among Defendants**

64.    The DIFRA information exchange operated as follows: Defendants submitted a report of their previous month's sales to an accounting firm.  Shipments were reported in tons shipped, subdivided by diameter size range (e.g., 2-12") and by joint type (*e.g.*, push-on; mechanical; flanged; ball and socket; grooved; and shoulder).  Data submissions were aggregated and distributed to each Defendant.  Data submitted to the accounting firm was typically no older than 45 days, and the summary reports returned to each Defendant contained data typically no more than 2 months old.

65.    During its operation between June 2008 and January 2009, the DIFRA information exchange enabled each of the Defendants to determine and to monitor its own market share and the output levels of its rivals.  In this way, the DIFRA information exchange facilitated price coordination among Defendants on the pricing of DIPF.

E.     **The April 2009 DIPF Price List**

66.    In April 2009 McWane announced a new price list for DIPF to become effective on May 1, 2009.  Subsequently, senior executives of McWane and Star had a telephone conversation during which Star sought assurances that McWane would implement its announced price list.  McWane provided those assurances.

67.    After receiving these assurances, Star adopted a similar price list for DIPF as McWane's price list.

68.    In connection with these new price lists, Sigma communicated with McWane and Star concerning an arrangement to alleviate McWane's concerns about secret discounting.

IV.    **McWane Intentionally Monopolized and Conspired with Sigma to Monopolize And Unreasonably Restrain Trade in the Domestic DIPF Market**

69.    On February 17, 2009, President Obama signed ARRA into law.  The new Act allocated more than $6 billion to water infrastructure projects throughout the United States.  The availability of ARRA funds for such projects was conditioned on the use of domestically produced materials, including Domestic DIPF.  That condition is known as the "Buy American" requirement.

70.    The passage of ARRA significantly altered the competitive landscape in the DIPF industry, and greatly expanded the Domestic DIPF Market.

71.    Before the passage of ARRA, McWane possessed monopoly power in the Domestic DIPF Market.  McWane was the only producer of a full line of Domestic DIPF, and consequently controlled nearly 100 percent of that market.

72.    ARRA's allocation of billions of dollars in funds for "Buy American" water infrastructure projects left McWane in a position to reap substantial monopoly profits.  At the same time, however, the expansion of the Domestic DIPF Market caused by ARRA gave Sigma

and Star a new incentive to enter the Domestic DIPF Market.  Indeed, Sigma and Star each took steps to enter the Domestic DIPF Market after ARRA was enacted.

73.     McWane, however, was able to maintain its monopoly in the Domestic DIPF Market by inducing Sigma to abandon its effort to enter the Domestic DIPF market, as described herein.  McWane also implemented an exclusive dealing and rebate policy as described herein to prevent and impede other competitors from entering, competing and expanding in the Domestic DIPF market.  Through this conduct, McWane excluded, impeded, eliminated or delayed competition in the Domestic DIPF Market.

74.     As a result of its efforts, following the passage of ARRA, McWane was able to maintain its monopoly power in the Domestic DIPF Market through the unlawful acts alleged below.  Currently, McWane's share of the Domestic DIPF Market continues to exceed 90 percent, despite Star's entry into that market in 2009.  McWane's monopoly power in the Domestic DIPF Market is demonstrated by its ability to exclude competitors, to control prices, and to impose unwanted distribution policies on its customers.

75.     McWane's monopoly power in the Domestic DIPF Market was and is protected by substantial barriers to effective entry and expansion.  Effective entry into the relevant DIPF markets requires a new entrant to develop an appropriate distribution network and a reputation for quality and service with waterworks distributors and end-users.  McWane's unfair and exclusionary methods of competition as described herein were and are barriers to effective entry into and expansion within the Domestic DIPF Market.

A.     **McWane's Elimination of Sigma as an Entrant Into the Domestic DIPF Market**

76.     After the enactment of ARRA, Sigma took steps to evaluate the desirability of entry into the Domestic DIPF Market, including but not limited to (i) formulating a complete or

16

nearly complete operational plan, (ii) arranging for an infusion of equity capital to fund domestic production, (iii) obtaining the approval of its Board of Directors for its domestic entry plans, and (iv) casting prototype product.

77.     McWane learned that Sigma was preparing to enter the Domestic DIPF Market. In response, McWane took steps to induce Sigma to become a distributor of McWane's Domestic DIPF products, rather than a competitor against McWane in the Domestic DIPF Market.  Sigma agreed with McWane that Sigma would become a McWane distributor rather than a competitor in the Domestic DIPF Market.

78.     Specifically, McWane and Sigma reached an agreement in September 2009, in which Sigma – rather than supplying its own DIPF products in the Domestic DIPF Market - would only supply Domestic DIPF from McWane.  McWane and Sigma fixed prices by agreeing that Sigma would sell Domestic DIPF at or very near McWane's published prices for Domestic DIPF.  Sigma also agreed that Domestic DIPF would be sold to a waterworks distributor only if the distributor agreed to purchase Domestic DIPF exclusively from McWane or Sigma.  An unwritten term of the agreement, which was understood and agreed to by the parties, was that McWane would also sell its Domestic DIPF to customers at or very near its published prices.

79.     Although Sigma thereby agreed not to act as a true competitor, Sigma did not participate in McWane's transactions with direct purchasers.  Sigma was not a party to sales by McWane to other purchasers of DIPF, and had no rights, obligations or duties – and received no benefits – from any sales by McWane to those purchasers or any terms McWane provided to its direct purchasers.

80.     In the absence of the financial inducements provided by McWane, Sigma would have entered the Domestic DIPF Market in competition with McWane.

81.     Under the agreement between McWane and Sigma, McWane controlled the price at which Sigma could sell Domestic DIPF and the customers to whom Sigma could sell Domestic DIPF. Sigma's participation in the Domestic DIPF Market under this agreement was not equivalent to, and for Plaintiffs and the McWane/Sigma Conspiracy Class (defined below) not a substitute for, Sigma's competitive entry into the Domestic DIPF Market.

82.     Sigma's independent, competitive entry into the Domestic DIPF Market would have benefited Plaintiffs and members of the McWane/Sigma Conspiracy Class by constraining McWane's prices for Domestic DIPF.  By instead conspiring to these restraints on competition, McWane transferred a share of its sales and monopoly profits in the Domestic DIPF Market to Sigma in exchange for Sigma's commitment to abandon its plans to enter that market as an independent competitor and to support a higher price level than would have existed if Sigma had entered the market as an independent competitor.

83.     Both McWane and Sigma entered into the agreement with the specific intent to maintain and share in McWane's monopoly profits in the Domestic DIPF market by eliminating competition among themselves and excluding their rivals.

**B.    McWane's Use of Exclusive Dealing And Rebate Policies to Limit Star's Entry Into the Domestic DIPF Market**

84.     Star formally announced its entry into the Domestic DIPF Market in June 2009. McWane knew that, initially, Star would have a limited product line and a smaller inventory than McWane.  Therefore, Star would have difficulty convincing a waterworks distributor to purchase all of its Domestic DIPF from Star.  Nevertheless, McWane projected that Star's entry into the Domestic DIPF Market, if unobstructed by McWane, would place downward pressure on Domestic DIPF prices.

85.     McWane responded to Star's entry into the Domestic DIPF Market by adopting restrictive and exclusive distribution policies. McWane intended and expected that such policies would impede and delay the ability of Star to enter the Domestic DIPF Market and compete with McWane in that Market.

(a)     McWane threatened waterworks distributors with delayed or diminished access to McWane's Domestic DIPF, and the loss of accrued rebates on the purchase of McWane's Domestic DIPF, if those distributors purchased Domestic DIPF from Star;

(b)     As part of its agreement with McWane, Sigma agreed to implement a similar distribution policy;

(c)     McWane threatened some waterworks distributors with the loss of rebates in other product categories, such as ductile iron pipe, waterworks valves, and hydrants, if those distributors purchased Domestic DIPF from Star;

(d)     McWane bundled rebates for pipes and DIPF to compel purchasers to buy DIPF from McWane, rather than Star, in order to be eligible for substantial rebates on other pipe products; and

(e)     Beginning in 2011, McWane changed its rebate structure for Domestic DIPF.  In order to qualify for rebates, waterworks distributors were required to make high percentages of their total Domestic DIPF purchases from McWane.

86.     The purpose and effect of McWane's exclusive dealing policies has been and is to compel the majority of waterworks distributors to deal with McWane and its distributor Sigma on an exclusive or nearly exclusive basis for their Domestic DIPF business.

87.     Distributors otherwise interested in purchasing Domestic DIPF from Star were and are unwilling to do so under the terms of McWane's exclusive dealing policies, and have remained exclusive or nearly exclusive with McWane and Sigma, contrary to their preference. McWane's exclusive dealing policies have foreclosed Star from a substantial volume of sales opportunities with waterworks distributors in the Domestic DIPF Market.

88.     By foreclosing Star from a substantial volume of sales opportunities with waterworks distributors, McWane's exclusive dealing and rebate policies minimized, impeded and delayed Star's ability to compete effectively in the Domestic DIPF Market and thereby caused Plaintiffs and other members of the affected Classes (defined below) to pay artificially inflated prices for Domestic DIPF.

89.     The acts and practices of McWane and Sigma, as alleged herein, have had the purpose, capacity, tendency, and effect of (i) maintaining and stabilizing prices of Domestic DIPF in the Domestic DIPF Market at artificially inflated supra-competitive levels, (ii) eliminating and excluding potential competition from Sigma in the Domestic DIPF Market, (iii) impairing the competitive effectiveness of Star in the Domestic DIPF Market, and (iv) raising barriers to entry for potential rivals in the Domestic DIPF Market.

90.     McWane and Sigma acted in concert, with the specific intent to monopolize the Domestic DIPF Market.

91.     There are no legitimate pro-competitive efficiencies that justify the conduct of McWane and Sigma, or that outweigh the anticompetitive effects of that conduct.

### C.     The Defendants' Actions Had a Significant Effect on the Price of DIPF

92.     The conspiracy between McWane, Sigma and Star to fix prices of DIPF starting in January 2008 had a significant effect on DIPF prices.  Despite a notable downturn in the United States economy, prices in the United States for DIPF increased 26 percent between 2007 and 2008 and climbed steeply over the course of the conspiracy, even as demand decreased.

93.     After the enactment of ARRA in February 2009, McWane began to use its monopoly power in the Domestic DIPF Market, both independently and in cooperation with

Sigma, to raise and maintain prices of Domestic DIPF at supra-competitive levels even as the United States was experiencing a deep recession during this same period, and demand decreased.

### THE FTC INVESTIGATES DEFENDANTS' ANTI-COMPETITIVE PRACTICES

94.     Based on its investigation into the conduct alleged herein, on January 4, 2012, the FTC filed two complaints against Defendants (collectively, the "FTC Complaints"), charging that the Defendants illegally conspired to set and maintain prices for DIPF at inflated levels, and that McWane illegally maintained its monopoly power in the Domestic DIPF Market.

95.     The FTC Complaints allege a broad range of unlawful, collusive and exclusionary conduct calculated to raise the price of DIPF, "an essential component of the nation's water infrastructure," said Richard Feinstein, Director of the FTC's Bureau of Competition.  "The FTC will act aggressively to protect cash-strapped municipalities and the consumers they serve from anticompetitive conduct."

96.     The FTC only files a complaint after determining, based on its investigation and review of information provided by the Defendants and third parties, that it has reason to believe that the law has been or is being violated.

97.     In determining that there was reason to believe that the Defendants violated the law, the FTC alleged, among other things, the following based on its investigation:

   a.     McWane, Star, and Sigma conspired to raise and stabilize the prices at which DIPF are sold and exchanged sales data in order to facilitate this price fixing;

   b.     McWane maintained its monopoly in the Domestic DIPF Market through exclusionary conduct, including "entering into a distribution agreement with Sigma that eliminated Sigma as an actual entrant into the domestic DIPF market" and "excluding actual and potential competitors, including Star, through the adoption and enforcement of exclusive dealing policies";

   c.     Senior executives of McWane, Star and Sigma frequently and privately communicated with one another and "[t]hese communications often relate to DIPF price and output";

d.      The January 2008 and June 2008 price increases described above were "the result of a combination and conspiracy" among McWane, Star and Sigma;

e.      The DIFRA information exchange enabled McWane, Star, and Sigma to determine and monitor market share, indirectly determine the output levels of their co-conspirators, and facilitate price coordination;

f.      These practices have had the effect of fixing, maintaining, and raising prices of DIPF; and

h.      Both McWane and Sigma acted "with the specific intent to maintain and share in McWane's monopoly profits in the relevant domestic DIPF market by eliminating competition among themselves and excluding their rivals."

98.      On the same day the FTC Complaints were filed, Sigma entered into a consent decree with the FTC in which it agreed not to engage in similar anticompetitive conduct in the future.

99.      On or about March 20, 2012, Star entered into a consent decree with the FTC in which it agreed not to engage in similar anticompetitive conduct in the future.  The complaint against McWane is scheduled to be heard before an administrative law judge.

## THE RELEVANT MARKETS ARE CONDUCIVE TO COLLUSION

100.      The DIPF Markets have several features that facilitate collusion among the Defendants, including but not limited to: (1) product homogeneity; (2) market concentration of DIPF suppliers; (3) barriers to timely entry of new DIPF suppliers; (4) inelastic demand; and (5) uniform published prices.

101.      **Product Homogeneity.** DIPF are commodity products, which are produced to industry-wide standards.  This product homogeneity enhanced Defendants' ability to collude on prices and to detect deviations from those collusive prices.

102.      **Market Concentration.** The relevant DIPF markets are highly concentrated.  In 2008, the Defendants collectively made more than 90 percent of sales in the relevant DIPF

markets.  The highly concentrated nature of the markets enhanced Defendants' ability and incentive to collude on prices.

103.    **Barriers to Entry.**  Effective entry into the relevant DIPF markets takes time and a substantial cash investment.  Barriers to entry include the need for a new entrant to develop a broad line of DIPF products, as well as a distribution network and a reputation for quality and service with waterworks distributors and end users.  Convincing customers to allow the use of a new entrant's DIPF can be a time-consuming process.

104.    **Inelasticity of Demand.** If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.  The quantity demanded of DIPF is price inelastic.  DIPF are a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for the product.  Such a condition favors and gives greater power to the sellers, such as the Defendants here, compared to the buyers in the market.

105.    **Uniformity of Published Prices.**  Defendants all published similar price books listing per-unit prices for each DIPF item carried by a given supplier.  In addition, Defendants periodically published uniform multiplier discounts at which they offered to sell DIPF.  By simplifying and standardizing published prices, the DIPF price list/multiplier format enhanced the Defendants' ability to collude on prices and to detect deviations from those collusive prices.

## THE ANTICOMPETITIVE EFFECTS OF THE DEFENDANTS' ANTITRUST VIOLATIONS

106.    The effects of Defendants' anticompetitive and exclusionary acts have been to artificially inflate and stabilize the price of DIPF above competitive levels, to significantly raise barriers to entry for potential rivals, and to unreasonably restrain trade in the relevant markets.

107.    The acts and practices of Defendants as alleged herein have had the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of rivals, raising rivals' costs, and deterring and impeding market entry. These activities have included:

(a)    Defendants agreed to adopt, and adopted, similar and increased pricing in January and June of 2008 and April 2009;

(b)    Defendants agreed to participate, and participated, in the DIFRA information exchange;

(c)    McWane and Sigma agreed that Sigma would not compete with McWane as a producer of Domestic DIPF, and would instead participate in McWane's monopoly of the Domestic DIPF Market by entering into an agreement with McWane and distributing McWane's domestically-produced DIPF under terms and prices agreed upon with McWane;

(d)    Defendants McWane and Sigma agreed to adopt restrictive exclusive dealing policies regarding Domestic DIPF.

108.    The contract, combination and conspiracy among and between all Defendants described herein constitutes an unreasonable restraint of interstate trade and commerce and a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.    The contract, combination or conspiracy between Defendants McWane and Sigma regarding the Domestic DIPF Market described herein constitutes a conspiracy to fix prices and monopolize interstate trade and commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

110.    Defendant McWane's acts of monopolization of the Domestic DIPF Market constitutes illegal monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

111.    The effects of the anticompetitive and exclusionary acts of McWane and Sigma have been to enable McWane to maintain more than ninety (90) percent of the relevant Domestic

DIPF Market, substantially to impair and foreclose competition from rivals for a substantial share of the relevant market, and to significantly raise barriers to entry for potential rivals.

112.    The unlawful conduct of McWane and Sigma has contributed significantly to the enhancement and maintenance of McWane's monopoly power in the Domestic DIPF Market.

113.    Defendants' conduct adversely affected competition and consumers by:  (a) increasing and maintaining prices for DIPF at artificially high, noncompetitive levels; (b) reducing the output of DIPF; (c) eliminating or significantly reducing price competition for DIPF; (d) deterring, delaying and impeding the ability of actual or potential competitors to enter or to expand their sales in the relevant markets; and (e) reducing consumer choice among competing DIPF suppliers.

114.    There are no legitimate pro-competitive efficiencies that justify Defendants' conduct or that outweigh the substantial anticompetitive effects of that conduct.

115.    Absent Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, Defendants would have faced additional competition, which would have driven down to competitive levels the prices for DIPF in the relevant markets.

116.    If Defendants' anticompetitive conduct had not prevented actual or potential DIPF suppliers from competing effectively in the market for such products, those actual or potential suppliers would have sold more DIPF, gained a larger market share, and achieved economies of scale and scope that would have further driven down market prices for DIPF in the relevant markets.

117.    As a result of Defendants' unlawful, anticompetitive conduct, Plaintiffs and members of the Classes were compelled to pay, and did pay, artificially inflated non-competitive prices for the DIPF they purchased.

118.    Plaintiffs and members of the Classes have, as a consequence, sustained losses and damage to their business and property in the form of the payment of overcharges for DIPF. The full amount of such damages is presently unknown at this time and will be calculated after discovery for proof at trial.

## CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on their own behalf and as representatives of the following classes of persons and entities (the "Classes"):

### The Price-Fixing Class

All persons or entities in the United States that purchased DIPF directly from any Defendant at any time from January 11, 2008 through May 31, 2009 (Class Period I). Excluded from the Price Fixing Class are Defendants and their subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, federal government entities and instrumentalities of the federal government.

### The Monopolization Class

All persons or entities in the United States that purchased Domestic DIPF directly from McWane from February 17, 2009 through the present (Class Period II).  Excluded from the Monopolization Class are Defendants and their subsidiaries, parents, or affiliates, whether or not named as a Defendant in this Complaint, federal government entities and instrumentalities of the federal government.

### The McWane/Sigma Conspiracy Class

All persons or entities in the United States that purchased Domestic DIPF directly from McWane or Sigma from

26

September 17, 2009 through January 3, 2012 (Class Period
III).  Excluded from the McWane/Sigma Conspiracy Class are
Defendants and their subsidiaries, parents, or affiliates,
whether or not named as a Defendant in this Complaint,
federal government entities and instrumentalities of the federal
government.

120.    Plaintiffs believe that there are at least hundreds of members in each of the above

Classes, their exact number and identities being known or knowable from records in Defendants'

possession, custody or control.  The members of the Classes are so numerous and geographically

dispersed that joinder of all members is impracticable.

121.    Plaintiffs' claims are typical of the claims of the members of each of the Classes.

122.    Plaintiffs and the members of the Classes have all sustained damage because they

purchased DIPF directly from one or more of the Defendants during the applicable Class Periods

at artificially inflated, supra-competitive prices that were established by Defendants' actions in

connection with the anticompetitive behavior alleged herein.  Defendants' anticompetitive

conduct, the effects of such violations, and the relief sought are all issues or questions that are

common to Plaintiffs and the other members of the Classes.

123.    Plaintiffs will fairly and adequately protect the interests of the members of each of

the Classes they seek to represent and are represented by counsel competent and experienced in

class action and antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic

to, the interests of the other members of the Classes.

124.    Common questions of law and fact exist as to all members of each of the Classes

and predominate over any questions affecting solely individual members of the Classes.

125.    The questions of law and fact common to the Classes include, but are not limited

to:

(a) Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize prices of DIPF sold in the United States;

(b) Whether this alleged conspiracy violated Section 1 of the Sherman Act;

(c) Whether Defendants McWane and Sigma engaged in a combination and conspiracy to monopolize and restrain trade in the Domestic DIPF Market;

(d) Whether the alleged McWane/Sigma conspiracy violated Sections 1 and 2 of the Sherman Act;

(e) Whether Defendants McWane and Sigma engaged in exclusive dealing, and other exclusionary, anticompetitive conduct;

(f) Whether Defendant McWane illegally monopolized the Domestic DIPF Market in violation of Section 2 of the Sherman Act;

(g) The duration of the conspiracies and conduct alleged in this Complaint;

(h) Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business and property of the Plaintiffs and other members of the Classes;

(i) The effect of the alleged conspiracies and monopolization on the prices of DIPF sold in the United States; and

(j) The appropriate measures of damages.

126.     Class actions are superior to other available methods for the fair and efficient adjudication of this controversy because the Classes are readily definable and prosecution of this lawsuit as a class action will eliminate the possibility of repetitive litigation.  Treatment as a class action will permit a large number of similarly situated entities to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This action presents no difficulties in management that would preclude its maintenance as a class action.

127.     Class actions are superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.

The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and the parties, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes, and would establish incompatible standards of conduct for Defendants.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Against All Defendants on Behalf of The Price-Fixing Class

128.   Plaintiffs incorporate by reference the allegations of paragraphs 1 through 127 above.

129.   This First Claim for Relief is brought by Plaintiffs Denver, Coastal, GCO, HI Line, Hoadley, Mountain States, Mountainland Supply, and Public Works on their own behalf and on behalf of the Price-Fixing Class defined in paragraph 119 above against all Defendants.

130.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  Defendants' agreement to fix, raise, maintain and stabilize the prices of DIPF in the United States was a violation of the Sherman Act.

131.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

132.   Beginning at least as early as January 2008, and continuing through at least May 2009, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators, by and through their officers, directors, employees agents and/or other representatives, entered into and participated in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices for DIPF sold in the United States.

133.    The Defendants' anti-competitive acts were intentionally directed at the market for DIPF and had a substantial and foreseeable effect on interstate commerce throughout the United States.

134.    The Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the DIPF Market.

135.    As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiffs and other members of the Price-Fixing Class have been injured in their business and property.  Plaintiffs and other Price-Fixing Class members have been harmed by being forced to pay higher prices for DIPF than they otherwise would have paid in the absence of Defendants' conspiracy.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

136.    In formulating and carrying out their unlawful agreement, understanding, combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

137.    Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

    (a)    Price competition in the DIPF Market has been restrained, suppressed and/or eliminated in the United States;

    (b)    Prices for DIPF sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

    (c)    Plaintiffs and members of the Price-Fixing Class have been deprived of the benefits of free and open competition.

138.    Accordingly, Plaintiffs and the Price-Fixing Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Against McWane on Behalf of The Monopolization Class

139.    Plaintiffs incorporate by reference the allegations of paragraphs 1 - 127 above.

140.    This Second Claim For Relief is brought by Plaintiffs GCO, HI Line, Mountain States, and Mountainland Supply on their own behalf and on behalf of the Monopolization Class defined in paragraph 119 above against Defendant McWane.

141.    Beginning at least as early as February 17, 2009, and continuing thereafter through the present, McWane monopolized the market for domestic DIPF sold in the United States, including the power to control prices and exclude competition.

142.    As alleged herein from and after February 17, 2009 through the present, McWane, by and through its officers, directors, employees, agents and/or other representatives, engaged in anticompetitive exclusionary conduct, as set forth above, that was intended to and had the effect of illegally establishing and maintaining McWane's monopoly in the Domestic DIPF Market, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

143.    McWane has effectively excluded competition from a significant and substantial portion of the Domestic DIPF Market, unlawfully expanded and maintained its dominant market share in the Domestic DIPF Market, and profited from its anticompetitive conduct by maintaining prices at artificially high levels and by otherwise reaping the benefits of its illegally maintained monopoly power in the Domestic DIPF Market.

144.    There is no legitimate business justification for McWane's anticompetitive actions and conduct through which it expanded and maintained its monopoly power in the

Domestic DIPF Market.  The anticompetitive effects of McWane's conduct far outweigh any conceivable pro-competitive benefit or justification.  Even if such justification existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

145.    As a direct and proximate result of McWane's anticompetitive conduct, Plaintiffs and members of the Monopolization Class have been injured in their business and property. Plaintiffs and the other members of the Monopolization Class have paid higher, artificially inflated prices for Domestic DIPF than they otherwise would have paid in the absence of McWane's conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes McWane's conduct unlawful.

146.    Accordingly, Plaintiffs and other members of the Monopolization Class seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### THIRD CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Against McWane and Sigma on Behalf of The McWane/Sigma Conspiracy Class

147.    Plaintiffs incorporate by reference the allegations of paragraphs 1 - 127 above.

148.    This Third Claim For Relief is brought by Plaintiffs GCO, HI Line, Mountain States, and Mountainland Supply on their own behalf and on behalf of the McWane/Sigma Conspiracy Class defined in paragraph 119 above against Defendants McWane and Sigma.

149.    Beginning at least as early as September 17, 2009, and continuing thereafter through at least January 3, 2012, McWane and Sigma, by and through their officers, directors, employees agents and/or other representatives, entered into and participated in a continuing agreement to monopolize the Domestic DIPF Market through the exclusionary, anticompetitive

conduct set forth above, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants McWane and Sigma did those things they agreed and conspired to do with the specific intent of monopolizing the Domestic DIPF Market.

150.    As a result of the conspiracy, McWane and Sigma effectively excluded competition from a significant, substantial portion of the Domestic DIPF Market, unlawfully expanded and maintained McWane's dominant market share in the Domestic DIPF Market, and profited from their anticompetitive conduct by maintaining prices at artificially high, supra-competitive levels and by otherwise reaping the benefits of their illegally obtained and maintained monopoly power.

151.    There is no legitimate business justification for the anticompetitive actions of McWane and Sigma and the conduct through which they acquired and maintained monopoly power in the Domestic DIPF Market.  The anticompetitive effects of the conduct of McWane and Sigma far outweigh any conceivable pro-competitive benefit or justification.  Even if such justification had existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

152.    As a direct and proximate result of the anticompetitive combination, contract, conspiracy and agreement of McWane and Sigma, Plaintiffs and members of the McWane/Sigma Conspiracy Class have been injured in their business and property.  Plaintiffs and the other members of the McWane/Sigma Conspiracy Class have paid higher, artificially inflated prices for Domestic DIPF than they otherwise would have paid absent McWane's and Sigma's conspiracy.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

153.     Accordingly, Plaintiffs and other members of the McWane/Sigma Conspiracy Class seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Against McWane and Sigma on Behalf of The McWane/Sigma Conspiracy Class

154.     Plaintiffs incorporate by reference the allegations of paragraphs 1 - 127 above.

155.     This Fourth Claim For Relief is brought by Plaintiffs GCO, HI Line, Mountain States, and Mountainland Supply on their own behalf and on behalf of the McWane/Sigma Conspiracy Class defined in paragraph 119 above against Defendants McWane and Sigma.

156.     Beginning at least as early as September 17, 2009, and continuing thereafter through at least January 3, 2012, McWane and Sigma, by and through their officers, directors, employees, agents and/or other representatives, entered into a continuing agreement to unreasonably restrain trade in the Domestic DIPF Market through agreements on prices to be charged and the exclusionary, anticompetitive conduct set forth above, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants McWane and Sigma did those things they agreed and conspired to do and unreasonably restrained trade in the Domestic DIPF Market.

157.     As a result of the conspiracy, McWane and Sigma effectively excluded competition from a significant, substantial portion of the Domestic DIPF Market, unlawfully acquired and expanded and maintained McWane's dominant market share in the Domestic DIPF Market, and profited from their anticompetitive conduct by maintaining prices at artificially high, supra-competitive levels.

158.     There is no legitimate business justification for the anticompetitive actions of McWane and Sigma and the conduct through which they unreasonably restrained trade in the

Domestic DIPF Market.  The anticompetitive effects of the conduct of McWane and Sigma far

outweigh any conceivable pro-competitive benefits or justification.  Even if such justification

had existed, any possible pro-competitive benefits could have been obtained by less restrictive

alternatives.

159.    As a direct and proximate result of the anticompetitive combination, contract and

conspiracy, Plaintiffs and members of the McWane/Sigma Conspiracy Class have been injured

in their business and property in that they have paid higher, artificially inflated prices for

Domestic DIPF than they otherwise would have paid absent McWane's and Sigma's conspiracy.

This injury is of the type the federal antitrust laws were designed to prevent and flows from that

which makes the Defendants' conduct unlawful.

160.    Accordingly, Plaintiffs and other members of the McWane/Sigma Conspiracy

Class seek damages, to be trebled pursuant to federal antitrust laws, and costs of suit, including

attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes respectfully request the following relief:

(a)    That the Court determine that this action may be maintained as a class action

under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure;

(b)    That the Court certify the Classes defined in this Complaint pursuant to Federal

Rule of Civil Procedure 23(a) and (b)(3), and designate Plaintiffs as the representatives for the

Classes and its counsel as counsel for the Classes;

(c)    That as to the First Claim for Relief, the contract, combination or conspiracy, and

the acts done in furtherance thereof, by all  Defendants be adjudged and decreed to be in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d)    That as to the Second Claim for Relief, the acquisition and maintenance by McWane of its monopoly, and the acts done in furtherance thereof by Defendant McWane be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. §2;

(e)    That as to the Third and Fourth Claims for Relief, the contract, combination or conspiracy, and the acts done in furtherance thereof, by Defendants McWane and Sigma be adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

(f)    That judgment be entered for Plaintiffs and members of the Classes against Defendants for three times the amount of damages sustained by them as allowed by law;

(h)    That Plaintiffs and the Classes recover pre-judgment and post-judgment interest as permitted by law;

(i)    That Plaintiffs and the Classes recover the costs of this suit, including attorneys' fees, as provided by law;

(j)    That Defendants be enjoined from continuing their unlawful acts described herein; and

(k)    That Plaintiffs and the Classes be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

Dated:   July 11, 2012

Respectfully submitted,

*/s/ Allyn Z. Lite*_____
Allyn Z. Lite
Steven J. Greenfogel
Mayra V. Tarantino
**LITE DePALMA GREENBERG, LLC**
Two Gateway Center, 12th Floor
Newark, NJ  07102
973.623.3000
alite@litedepalma.com
sgreenfogel@litedepalma.com
mtarantino@litedepalma.com
*Interim Co-Liaison Counsel*

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY  10022
212.687.1980
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com

Gary L. Specks
**KAPLAN FOX & KILSHEIMER LLP**
423 Sumac Road
Highland Park, IL 60035
847.831.1585
gspecks@kaplanfox.com
*Interim Co-Lead Counsel*

*/s/ Karen A. Confoy*_____
Karen A. Confoy
**STERNS & WEINROTH, PC**
50 W. State Street, Suite 1400
Trenton, New Jersey  08608
609.392.2100
kconfoy@sternslaw.com
*Interim Co-Liaison Counsel*

Kit A. Pierson
Richard A. Koffman
Meghan Boone
**COHEN MILSTEIN SELLERS &
   TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West
Washington, DC  20005
202.408.4600
kpierson@cohenmilstein.com
rkoffman@cohenmilstein.com
mboone@cohenmilstein.com
*Interim Co-Lead Counsel*

**ADDITIONAL COUNSEL FOR
PLAINITIFFS:**

Benjamin L. Bailey
Michael L. Murphy
**BAILEY & GLASSER, LLP**
910 17th Street, NW
Suite 800
Washington, DC  20006
202.463.2101
bbailey@baileyglasser.com
mmurphy@baileyglasser.com

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice Enders
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103
215.875.3000
hlmontague@bm.net
rgordon@bm.net
cenders@bm.net

Peter S. Pearlman
**COHN LIFLAND PEARLMAN
   HERMANN & KNOFF LLP**
Park 80 West – Plaza One
250 Pehle Ave., Suite 401
Saddle Brook, NJ  07663
201.845.9600
psp@njlawfirm.com

Wayne A. Mack
J. Manly Parks
Sean S. Zabaneh
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA  19063
216.979.1152/1342
wmack@duanemorris.com

Hollis Salzman
Kellie Lerner
**LABATON SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY  10005
212.907.0700
hsalzman@labaton.com
klerner@labaton.com

Brent N. Rushforth
**MCKOOL SMITH**
1999 K Street, NW
Suite 600
Washington, DC  20006
202.370.8300
brushforth@mckoolsmith.com

Gregory B. Kanan
Michael D. Plachy
Thomas M. Rogers III
Nathaniel S. Barker
**ROTHGERBER JOHNSON & LYONS LLP**
1200 17th Street
Suite 300
Denver, CO  80202
303.623.9000
gkanan@rothgerber.com
mplachy@rothgerber.com
trogers@rothgerber.com
nbarker@rothgerber.com

James B. Sloan
**JAMES B. SLOAN LTD.**
One Westminster Place
Lake Forest, IL  60045
312.315.5315
jsloan@sloanlegal.com

jmparks@duanemorris.com
sszabaneh@duanemorris.com

Roberta Liebenberg
Donald Perelman
Ria C. Momblanco
**FINE KAPLAN & BLACK RPC**
1835 Market Street, 28th Floor
Philadelphia, PA  19103
215.567.6565
rliebenberg@finekaplan.com
dperelman@finekaplan.com
rmomblanco@finekaplan.com

Brian Douglas Penny
**GOLDMAN SCARLATO KARON &**
   **PENNY, P.C.**
101 East Lancaster Avenue, Suite 204
Wayne, PA  19087
484.342.0700
penny@gskplaw.com

Linda P. Nussbaum
Susan R. Schwaiger
**GRANT & EISENHOFER, PA**
484 Lexington Avenue
New York, NY 10017
646.722.8500
lnussbaum@gelaw.com
sschwaiger@gelaw.com

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Mineapolis, MN  55403
612.338.4605
vesades@heinsmills.com

Michael P. Thornton
Garrett J. Bradley
**THORNTON & NAUMES, LLP**
100 Summer Street, 30th Floor
Boston, MA  02110
888.491.9726
mthornton@tenlaw.com
gbradley@tenlaw.com

M. Michael Waters
**VONACHEN, LAWLESS, TRAGER**
   **& SLEVIN**
456 Fulton Street, Suite 425
Peoria, IL  61602
309.676.8986
mwaters@vltslaw.com

John Zaremba
**ZAREMBA BROWNELL & BROWN PLLC**
40 Wall Street
New York, NY  10005
212.400.7224
jzaremba@zbblaw.com