NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In RE Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation | Civ. No. 12-711 OPINION |

THOMPSON, U.S.D.J.

I.  INTRODUCTION

This matter has come before the Court upon two motions to dismiss.  Defendant Star Pipe Products, Ltd. ("Star Pipe Products") filed a Motion to Dismiss Count One of the Direct Purchaser Plaintiffs' Consolidated Amended Complaint.  (Docket Entry No. 95).  Defendants McWane, Inc. ("McWane") and Sigma Corporation ("Sigma") filed a Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint.  (Docket Entry No. 96).  Plaintiffs City and County of Denver ("Denver"), Coastal Plumbing Supply Company, Inc. ("Coastal"), GCO, Inc. ("GCO"), Hi Line Supply Co., Ltd. ("Hi Line"), John Hoadley and Sons, Inc. ("Hoadley"), Mountain States Supply, LLC ("Mountain States"), Mountainland Supply, LLC ("Mountainland"), and Public Works Supply Co., Inc. ("Public Works"), (collectively, "Direct Purchaser Plaintiffs"), oppose the motions.  (Docket Entry Nos. 102, 103).  The Court has decided these matters upon consideration of the parties' written submissions and oral argument

1

conducted on January 14, 2013.  For the reasons given below, Defendants' motions to dismiss are denied.

## II.  BACKGROUND

This case concerns antitrust violations allegedly committed by manufacturers and distributors of ductile iron pipe fittings ("DIPF").  In their amended complaint ("Amended Complaint"), Direct Purchaser Plaintiffs allege that each defendant conspired to fix DIPF prices in violation of Section 1 of the Sherman Act, and that McWane and Sigma violated Sections 1 and 2 of the Sherman Act through acts to unlawfully maintain McWane's monopoly control of the domestic DIPF market and otherwise restrain trade.  Defendants seek to have the Amended Complaint dismissed under Rule 12(b)(6).  For the purposes of the pending motion, the Court considers as true all of Direct Purchaser Plaintiffs' well-pleaded factual allegations.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

### A.  *Ductile Iron Pipe Fittings Market*

Ductile iron pipes are made of a ferrous material that makes them particularly strong and durable.  (Am. Compl., Docket Entry No. 78 at ¶ 1).  As a result, ductile iron pipes are well-suited for use in high-pressurized water systems and have become the industry standard for water and wastewater systems.  (*Id*. at ¶¶ 1, 40).

Ductile iron pipes are joined together using DIPF.  (*Id*. at ¶¶ 2, 41).  As non-ductile iron pipe fittings are not suitable for use in ductile iron pipe systems, there is no widely-used substitute for DIPF.  (*Id*. at ¶¶ 41, 48).  Thus, DIPF are integral to municipal and regional water systems in the United States that transport drinking and waste water under pressurized conditions.  (*Id*. at ¶¶ 8, 40, 42).

DIPF, which are produced in a variety of configurations of sizes, shapes, and coatings, are either manufactured domestically or imported.  (*Id*. at ¶¶ 42, 44).  Defendants sell imported DIPF and were responsible for making approximately 90 percent of DIPF sales in 2008.  (*Id*. at ¶¶ 44, 48).  McWane also sells domestic DIPF and "was the only producer of a full line of [d]omestic DIPF," controlling nearly 100 percent of the domestic DIPF market.  (*Id*. at ¶ 71).

Defendants sell DIPF directly to independent wholesale distributors ("waterworks distributors"), which specialize in distributing products for water infrastructure projects and are the primary channel of DIPF to end users.  (*Id*. at ¶ 43).  Defendants also sell DIPF directly to municipal and regional water authorities.  (*Id*.).

Finally, at the time of the events giving rise to Direct Purchaser Plaintiffs' allegations, DIPF pricing information was publicly available in two ways.  First, "Defendants all published . . . price books listing per-unit prices for each DIPF item carried by a given supplier."  (*Id*. at ¶ 105).  Second, "Defendants [also] periodically published uniform multiplier discounts at which they offered to sell DIPF."  (*Id*.).

B. *Price Fixing Conspiracy*

Direct Purchaser Plaintiffs allege that from "at least as early as January 2008 and continuing at least until May 2009, Defendants agreed and conspired to fix, raise, maintain and stabilize, and did in fact fix, raise, maintain and stabilize, the prices at which DIPF (imported and domestic) were sold in the United States."  (*Id*. at ¶ 50).  Defendants wanted to increase their prices in 2008 and communicated with each other frequently and in private regarding DIPF prices, output, and increases in prices.  (*Id*. at ¶ 52).  Through these conversations, Defendants "arranged and agreed upon a system by which they would all accomplish price increases through the use of seemingly unilaterally announced price increases."  (*Id*.).  They agreed that "if one of

3

them announced a price increase on DIPF, then the other Defendants would subsequently announce a similar increase in their prices."  (*Id*.).

### 1.  *January 2008 Price Increase*

McWane sought to increase its prices in January 2008.  (*See id*. at ¶¶ 52-54).  Despite Defendants' agreement, McWane "was concerned that Sigma and [Star Pipe Products] would not adhere to McWane's announced price increases" and that McWane would suffer lost sales as a result.  (*Id*. at ¶ 53).  Consequently, "McWane agreed to implement higher prices only if Sigma and [Star Pipe Products] changed their business methods to reduce the risk that their local sales personnel would sell DIPF at lower-than-published prices."  (*Id*. at ¶ 55).  McWane communicated to Sigma and Star Pipe Products the terms of its plan to restrain price competition, and they, in turn, "communicated their understanding and acceptance of McWane's offer . . . by publicly taking steps to limit their discounting from published price levels . . . ."  (*Id*. at ¶ 56).

Following this new agreement, McWane publicly announced on January 11, 2008, that it was increasing prices.  (*Id*. at ¶ 54).  Sigma and Star Pipe Products announced "similar" price increases "[s]oon thereafter."  (*Id*.).  McWane and Sigma executives discussed their efforts to implement the January 2008 price increase by phone on or about March 10, 2008.  (*Id*.).

### 2.  *June 2008 Price Increase*

Before raising prices again, McWane entered into an agreement with Sigma and Star Pipe Products to do so in exchange for information about the volume of Sigma and Star Pipe Products' monthly sales of DIPF.  (*Id*. at ¶ 59).  The information was exchanged through an entity named the Ductile Iron Fittings Research Association ("DIFRA") that operated from June 2008 until January 2009.  (*Id*. at ¶¶ 59, 65).  Through DIFRA, Defendants submitted their

previous month's sales to an accounting firm that aggregated and distributed the information to each Defendant. (*Id.*). The data submitted to the accounting firm was typically no older than 45 days, and the reports returned to each defendant contained data typically no more than two months old. (*Id.* at ¶ 65). Thus, according to Direct Purchaser Plaintiffs, sharing this information about recent sales volume enabled Defendants to facilitate price coordination by providing each defendant with the means to monitor its own market share and the output of its rivals. (*Id.* at ¶¶ 64-65).

   The terms of McWane's offer to raise prices in exchange for Sigma and Star Pipe Products' participation in DIFRA were communicated in conversations between Defendants, as well as a public letter sent by McWane to its waterworks distributors. (*Id.* at ¶ 60). According to Direct Purchaser Plaintiffs, a portion of the letter was not relevant to the waterworks distributors and was, instead, intended to inform Sigma and Star Pipe Products of the terms of McWane's proposed price increases. (*Id.*). To communicate their understanding and acceptance of McWane's offer, Sigma and Star Pipe Products began participating in the DIRFA information exchange in June 2008. (*Id.* at ¶ 61).

   On June 17, 2008, McWane publicly announced the second DIPF price increase. (*Id.* at ¶ 58). Sigma and Star Pipe Products announced similar price increases soon after. (*Id.*). McWane and Sigma discussed the implementation of the June price increase by phone on or about August 22, 2008. (*Id.* at ¶ 63).

   3.  *April 2009 Price List*

   In April 2009, McWane announced a new price list for DIPF that was to become effective on May 1, 2009. (*Id.* at ¶ 66). Senior executives of McWane and Star Pipe Products then spoke by phone and Star Pipe Products sought assurances that McWane would implement

the announced price list.  (*Id*.).  After receiving such assurances, Star Pipe Products adopted a

similar price list.  (*Id*. at ¶¶ 66-67).  Sigma also "communicated with McWane and [Star Pipe

Products] concerning an arrangement to alleviate McWane's concerns about secret discounting."

(*Id*. at ¶ 68).

### C.  Monopolization Conspiracy

On February 17, 2009, President Obama signed the American Recovery and

Reinvestment Act of 2009 ("ARRA"), which allocated more than $6 billion to fund the

construction of water infrastructure products.  (*Id*. at ¶¶ 10, 69).  Through a "Buy American"

provision, the ARRA required certain public works projects to use only goods produced in the

United States and, thus, greatly expanded the market for domestic DIPF.  (*Id*. at ¶¶ 46, 70).

Prior to passage of the ARRA, McWane was the only producer of a full line of domestic

DIPF and controlled nearly 100 percent of the market.  (*Id*. at ¶ 71).  Therefore, due to inclusion

of the "Buy American" provision in the ARRA, McWane was poised to reap substantial profits.

(*Id*. at ¶ 72).  The prospect of such profits in the domestic DIPF market provided both Sigma and

Star Pipe Products with a new incentive to enter the domestic DIPF market.  (*Id*.).

#### 1.  Sigma's Elimination as an Entrant to the Domestic DIPF Market

After enactment of the ARRA, Sigma considered entering the domestic DIPF market.

(*Id*.).  Specifically, Sigma "(i) [formulated] a complete or nearly complete operational plan, (ii)

[arranged] for an infusion of equity capital to fund domestic production, (iii) [obtained] the

approval of its Board of Directors for its domestic entry plans, and (iv) [casted] prototype

product."  (*Id*. at ¶ 76).

Upon learning of these preparations to enter the domestic DIPF market, "McWane took

steps to induce Sigma to become a distributor of McWane's [d]omestic DIPF products, rather

than a competitor against McWane in the [d]omestic DIPF Market." (*Id*. at ¶ 77). Sigma agreed. (*Id*.).

Under the agreement reached in September 2009, "McWane and Sigma fixed prices by agreeing that Sigma would sell [d]omestic DIPF at or very near McWane's published prices for [d]omestic DIPF." (*Id*. at ¶ 78). Additionally, Sigma agreed to only sell domestic DIPF to waterworks distributors that agreed to purchase domestic DIPF exclusively from McWane or Sigma. (*Id*.). "An unwritten term of the agreement, which was understood and agreed to by the parties, was that McWane would also sell its [d]omestic DIPF to customers at or very near its published prices." (*Id*.). Absent the agreement and financial inducements that flowed from it, "Sigma would have entered the [d]omestic DIPF Market in competition with McWane." (*Id*. at ¶ 80). Therefore, through the financial inducements provided for in the agreement, McWane eliminated Sigma as a potential competitor in the domestic DIPF market. (*Id*. at ¶¶ 78-80).

### 2. *Star Pipe Products' Elimination as an Entrant to the Domestic DIPF Market*

In June 2009, Star Pipe Products announced that it was entering the domestic DIPF market. (*Id*. at ¶ 84). Because it would have a limited product line and a smaller inventory, Star Pipe Products was likely to have difficulty convincing a waterworks distributor to purchase from it exclusively. (*Id*.). Despite this, McWane anticipated that Star Pipe Products' entry into the market would "place downward pressure" on domestic DIPF prices. (*Id*.).

As a result, McWane responded to the news of Star Pipe Products entry into the domestic DIPF market by "adopting restrictive and exclusive distribution policies" to "impede and delay the ability of [Star Pipe Products] to enter the [d]omestic DIPF Market and compete with McWane . . . ." (*Id*. at ¶¶ 84-85). Specifically, "McWane threatened waterworks distributors with delayed or diminished access to McWane's [d]omestic DIPF, and the loss of accrued

rebates on the purchase of McWane's [d]omestic DIPF, if those distributors purchased [d]omestic DIPF from [Star Pipe Products]." (*Id*. at ¶ 85). Sigma, pursuant its agreement with McWane, "agreed to implement a similar distribution policy." (*Id*.). Additionally, "McWane threatened some waterworks distributors with the loss of rebates in other product categories, such as ductile iron pipe, waterworks valves, and hydrants, if those distributors purchased [d]omestic DIPF from [Star Pipe Products]." (*Id*.). McWane also "bundled rebates for pipes and DIPF to compel purchasers to buy DIPF from McWane, rather than [Star Pipe Products], in order to be eligible for substantial rebates on other pipe products." (*Id*.). Finally, "[b]eginning in 2011, McWane changed its rebate structure for [d]omestic DIPF" to require waterworks distributors to make high percentages of their total [d]omestic DIPF purchased from McWane to qualify for rebates. (*Id*.).

Through these policies, McWane intended to "compel the majority of waterworks distributors to deal with McWane and its distributor Sigma on an exclusive or nearly exclusive basis for their [d]omestic DIPF business." (*Id*. at ¶ 86). "Distributors otherwise interested in purchasing [d]omestic DIPF from [Star Pipe Products] were and are unwilling to do so" and "have remained exclusive or nearly exclusive with McWane and Sigma, contrary to their preference." (*Id*.). As a result, Star Pipe Products was foreclosed from a substantial volume of sales opportunities with waterworks distributors in the domestic DIPF Market. (*Id*.).

D. *Federal Trade Commission Investigation*

On January 4, 2012, the Federal Trade Commission ("FTC") filed two complaints against Defendants, charging that they illegally conspired to set and maintain prices for DIPF at inflated levels and that McWane illegally maintained its monopoly power in the domestic DIPF market. (*Id*. at ¶ 94).

E.  *Instant Lawsuit*

Direct Purchaser Plaintiffs comprise three classes of persons and entities.  (Id. at ¶ 119).
The Price Fixing Class consists of "[a]ll persons or entities in the United States that purchased
DIPF directly from any Defendant at any time from January 11, 2008 through May 31, 2009."
(*Id.*).  The Monopolization Class consists of "[a]ll persons or entities in the United States that
purchased [d]omestic DIPF directly from McWane from February 17, 2009 through the present."
(*Id.*)  Finally, the McWane/Sigma Conspiracy Class consists of "[a]ll persons or entities in the
United States that purchased [d]omestic DIPF directly from McWane or Sigma from September
17, 2009 through January 3, 2012."1  (*Id.*).

The Amended Complaint sets forth four counts.  (*Id.* at ¶¶ 128-160).  In Count One,
Plaintiffs Denver, Coastal, GCO, Hi Line, Hoadley, Mountain States, Mountainland, and Public
Works on behalf of the Price Fixing Class seek treble damages, costs, and attorneys' fees from
all Defendants for conspiring to fix, maintain, and stabilize DIPF prices in violation of Section 1
of the Sherman Act.  (*Id.* at ¶¶ 128-138).  In Count Two, Plaintiffs GCO, Hi Line, Mountain
States, and Mountainland on behalf of the Monopolization Class seek treble damages, costs, and
attorneys' fees from McWane for monopolizing the domestic DIPF market in violation of
Section 2 of the Sherman Act.  (*Id.* at ¶¶ 139-146).  In Count Three, Plaintiffs GCO, Hi Line,
Mountain States, and Mountainland on behalf of the McWane/Sigma Conspiracy Class seek
treble damages, costs, and attorneys' fees from McWane and Sigma for conspiring to
monopolize the domestic DIPF market in violation of Section 2 of the Sherman Act.  (*Id.* at ¶¶
147-153).  Finally, in Count Four, Plaintiffs GCO, Hi Line, Mountain States, and Mountainland

---

1 Each of the three classes excludes "Defendants and their subsidiaries, parents, or affiliates,
whether or not named as a Defendant in [the Amended] Complaint, federal government entities
and instrumentalities of the federal government."  (*Id.*).

on behalf of the McWane/Sigma Conspiracy Class seek treble damages, costs, and attorneys' fees against McWane and Sigma for conspiring to unreasonably restrain trade in violation of Section 1 of the Sherman Act.  (*Id.* at ¶¶ 154-160).  Direct Purchaser Plaintiffs contend that, as a result of Defendants' unlawful conduct, they were "injured in their business and property" and were "forced to pay higher prices for DIPF than they otherwise would have paid in the absence of Defendants' conspiracy."  (*Id.* at ¶¶ 135, 145, 152, 159).

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis.  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  But, the court should disregard any conclusory allegations proffered in the complaint.  *Id*.  Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for

10

relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).  This requires more than a mere allegation

of an entitlement to relief.  *Id*.  "A complaint has to 'show' such an entitlement with its

facts."  *Id*.  A claim is only plausible if the facts pled allow a court to reasonably infer that the

defendant is liable for the misconduct alleged.  *Id*. at 210 (quoting *Iqbal*, 556 U.S. at 678).  Facts

suggesting the "mere possibility of misconduct" fail to show that the plaintiff is entitled to

relief.  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

## IV. <u>ANALYSIS</u>

Defendants raise a number of arguments in support of their motions to dismiss.  The

Court addresses each argument in turn.

### A. *Standing*

Star Pipe Products moves to have Count One dismissed for lack of standing under Rule

12(b)(6).  (Docket Entry No. 95, Attach. 1).  The requirement that each plaintiff have standing is

derived from Article III of the U.S. Constitution.  *See Arizona Christian Sch. Tuition Org. v.*

*Winn*, 131 S.Ct. 1436, 1441 (2011).  "It is moored in the constitutional principle that the

judiciary's power only extends to cases or controversies."  *Ethypharm S.A. France v. Abbott*

*Labs.*, No. 11-3602, 2013 WL 238794, at *5 (3d Cir. 2013).  Constitutional standing is

"augmented by consideration of prudential limitations."  *City of Pittsburgh v. W. Penn Power*

*Co.*, 147 F.3d 256, 264 (3d Cir. 1998).  "For plaintiffs suing under federal antitrust laws, one of

the prudential limitations is the requirement of 'antitrust standing.'"  *Ethypharm*, 2013 WL

238794, at *5 (citing *W. Penn Power*, 147 F.3d at 264).

Courts consider five factors when deciding whether a complainant has antitrust standing:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and
the intent by the defendant to cause that harm, with neither factor alone conferring
standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust
laws were intended to provide redress; (3) the directness of the injury, which addresses

the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993). "The second factor, antitrust injury, is a necessary but insufficient condition of antitrust standing." *Ethypharm*, 2013 WL 238794, at *5 (citing *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)). Therefore, "[i]f antitrust injury is not found, further inquiry is unnecessary." *W. Penn Power*, 147 F.3d at 265.

Antitrust injury requires that "the injury [suffered by the plaintiff] be casually linked to an illegal presence in the market." *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "To this end, a plaintiff must show both harm of the type the antitrust laws were intended to prevent, and an injury to the plaintiff which flows from that which makes the defendant's actions unlawful." *In re Neurontin Antitrust Litig.*, No. 02-1390, 2009 WL 2751029, at *10 (D.N.J. Aug. 28, 2009) (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)). Plaintiffs may show antitrust injury by proving that they paid a higher price for goods purchased from the defendant than they would have paid absent the alleged conspiracy. *In re Titanium Dioxide Antitrust Litig.*, No. 10-0318, 2012 WL 3711890, at *10 (D. Md. Aug. 28, 2012) (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968)).

The party seeking to exercise jurisdiction in his favor bears the burden of alleging facts that demonstrate standing. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (internal citations omitted). Standing cannot be "inferred argumentatively from averments in the pleadings," but rather "must affirmatively appear in the record." *Id.* (quoting *Grace v. Am. Cent. Ins. Co.*, 109 U.S. 278, 284 (1883)). While the court "must accept as true all material allegations of the

complaint and construe the complaint in favor of the complaining party, . . . it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Here, Defendants argue that Direct Purchaser Plaintiffs lack standing because they "allege no facts in their [Amended Complaint] about the prices they paid for DIPF, other than to label the prices 'inflated' or 'artificially high.'" (Docket Entry No. 95, Attach. 1 at 4). They argue that, therefore, Direct Purchaser Plaintiffs have not provided sufficient facts to show that they were actually injured by the anticompetitive acts allegedly committed by Defendants. (*Id.*).

The Court does not agree. While it is true that Direct Purchaser Plaintiffs do not state the actual price that they paid for DIPF, they allege that they purchased DIPF directly from Defendants at a time when either (1) Defendants conspired to fix prices; or (2) McWane conspired with Sigma to fix prices, prevented Sigma from entering the domestic DIPF market, and adopted exclusive rebate policies to limit Star Pipe Product's presence in the market.[2] With allegations such as these where Direct Purchaser Plaintiffs claim they paid higher prices than they would have had competition not been restrained, it is unclear how information about the specific price paid for the DIPF would enhance the plausibility of Direct Purchaser Plaintiffs' claims.

Star Pipe Products makes an additional argument for dismissal of Count One. It argues that dismissal is necessary because Direct Purchaser Plaintiffs failed to allege that they paid the fixed list prices rather than an individually negotiated deviation, such as a rebate, individual discount, cash discount, or special freight allowance. (*Id.*). Star Pipe Products argues that "the

---

[2] As discussed in greater detail below, the Court finds that Direct Purchaser Plaintiffs' have pled sufficient facts to render these allegations plausible.

pertinent inquiry is on the prices actually paid, the transaction prices," rather than the list price. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129 (3d Cir. 1999).

Star Pipe Products cites three cases to support its contention that Direct Purchaser Plaintiffs must specifically plead that they purchased DIPF at the list price.  In each of the cases, the court dismissed the plaintiffs' price fixing claims where there was no showing that plaintiffs had purchased goods at a price affected by the alleged price fixing scheme.  *See Lum v. Bank of Am.*, 361 F.3d 217, 231-232 (3d Cir. 2004); *In re Baby Food*, 166 F.3d at 129; *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st Cir. 1988).  For example, in *Lum*, the court dismissed the plaintiffs' antitrust claims where the plaintiffs showed that there was price parallelism as to the prime rate set by banks, but not to the final interest rate charged to consumers.  *Lum*, 361 F.3d at 231-232.  Thus, where there were "discounts and competition regarding how many percentage points above the prime rate that banks may charge, there is not price parallelism in the final interest rate charged to consumers."  *Id*. at 232.

Similarly, in *In re Baby Food*, the court dismissed the plaintiffs' price fixing claims where they showed price parallelism only among defendants' list prices, not the prices actually paid.  166 F.3d at 128-29.  Where plaintiffs allege a price fixing antitrust claim, "the pertinent inquiry is on the prices actually paid, the transaction prices."  *Id*. at 129.  Therefore, failure to show that the prices actually paid by plaintiffs were prices subject to the price fixing scheme warranted dismissal of plaintiffs' price fixing claim.  *Id*.

Direct Purchaser Plaintiffs do not contest that the cases cited by Defendants require a plaintiff to show that the transaction price, rather than the list price, was subject to the price fixing scheme.  Instead, Direct Purchaser Plaintiffs argue that such specificity is not required at the pleading stage.  They point out that the Amended Complaint contains allegations concerning

14

(1) the type of DIPF (domestic or imported) purchased by each plaintiff; (2) from which Defendants they purchased DIPF; and (3) the time periods during which each plaintiff made its purchases. Direct Purchaser Plaintiffs contend that this information, accompanied by allegations that they purchased directly from Defendants during the relevant period at artificially inflated prices and paid more for DIPF than they would have absent Defendants' unlawful conduct, is sufficient.

In support of this contention, Direct Purchaser Plaintiffs argue that the cases cited by Defendants are inapposite because they were decided at the summary judgment stage or involved a motion to dismiss subject to a heightened pleading standard. They cite instead to *In re Magnesium Oxide Antitrust Litigation*, No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011), in which the court refused to dismiss the plaintiffs' price fixing claim, stating:

> As a general matter, [Direct Purchaser] Plaintiffs' allegation that they were "injured by having paid more for MgO than they otherwise would have paid absent [D]efendants' unlawful conduct" . . . is sufficient to establish standing. . . . Here, there is little doubt that those who purchased [the products in question] directly from Defendants at supracompetitive prices have standing to sue for damages under Section 4 and for injunctive relief under Section 16.

2011 WL 5008090, at *6. Direct Purchaser Plaintiffs argue that, applying this logic, their allegations that they paid "inflated" and "artificially high" prices are sufficient.

The Court agrees. Here, Direct Purchaser Plaintiffs have stated the type of DIPF they purchased, from which defendant they purchased DIPF, and the time period during which the purchases were made. To require Direct Purchaser Plaintiffs to plead additional facts showing that they did not purchase DIPF at a discounted or individually negotiated price would require Direct Purchaser Plaintiffs to plead facts in anticipation of Defendants' defenses. Such facts may be necessary at the summary judgment stage or in antitrust cases subject to a heightened pleading standard, as was the case in *Lum*, *In re Baby Food*, and *Clamp-All Corp.*; however, "the pleading

15

standard Rule 8 announces does not require detailed factual allegations . . . ."  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Furthermore, *In re Magnesium Oxide* supports the conclusion that "[Direct Purchaser] Plaintiffs' allegation that they were injured by having paid more . . . than they otherwise would have paid absent [D]efendants' unlawful conduct . . . is sufficient to establish antitrust standing.  *See* 2011 WL 5008090, at *6.  Therefore, Direct Purchaser Plaintiffs have pled sufficient facts to establish standing.

###### B.  *Antitrust Impact*

Defendants also argue that each count should be dismissed because Direct Purchaser Plaintiffs have failed to adequately allege antitrust injury.  (Docket Entry No. 96, Attach. 1 at 42-44).  These arguments are similar to those made by Star Pipe Products in its motion to dismiss on standing grounds and, as explained below, are similarly unavailing.

The elements of an antitrust claim are "(1) a violation of the antitrust laws . . ., (2) individual injury resulting from that violation, and (3) measurable damages."  *In re Hydrogen Peroxide Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).  Therefore, "to prevail on the merits, every class member must prove at least some antitrust impact resulting from an alleged violation."  *Id.* (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977)).  Antitrust impact is "injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes defendants' acts unlawful."  *See* 15 U.S.C. § 15(a) (2000); *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 479 U.S. 489 (1977).

Defendants argue that, under *Twombly*, Direct Purchaser Plaintiffs have failed to adequately allege antitrust impact because the Amended Complaint is "devoid of *any* facts regarding any prices actually paid, let alone facts establishing that any price was 'artificially

inflated' or 'supra-competitive.'"  (Docket Entry No. 96, Attach. 1 at 43).  Defendants cite no

authority, however, for their proposition that Direct Purchaser Plaintiffs' allegations are

insufficient under *Twombly*.  As such, the Court is inclined to agree with Direct Purchaser

Plaintiffs that their allegations that they purchased DIPF directly from Defendants at a time when

either (1) Defendants conspired to fix prices; or (2) McWane conspired with Sigma to fix prices,

prevented Sigma from entering the domestic DIPF market, and adopted exclusive rebate policies

to limit Star Pipe Product's presence in the market, are sufficient.

   *C.  Count One*

     Defendants argue that Count One of the Amended Complaint – the price fixing claim

under Section 1 of the Sherman Act – should be dismissed under Rule 12(b)(6) because Direct

Purchaser Plaintiffs failed to plead facts suggesting Defendants entered into an agreement to fix

prices.  (Docket Entry No. 96, Attach. 1 at 17-28).  As such, Defendants contend that Direct

Purchaser Plaintiffs have failed to allege anything other than lawful, follow-the-leader pricing.

(*Id*.).

     Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  "The first element – a

contract, combination, or conspiracy – requires 'some form of concerted action,' which we

define as 'unity of purpose or a common design and understanding or a meeting of minds' or 'a

conscious commitment to a common scheme.'" [3]  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212,

221 (3d Cir. 2011) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir.

2010)).

---

[3] Defendants do not challenge the second element – an unreasonable restraint on trade.

To plead such a meeting of the minds, a mere "allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "Parallel conduct in itself is insufficient to state a plausible claim because it is 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *Burch*, 662 F.3d at 227 (quoting *Twombly*, 550 U.S. at 554).  "[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986).  Therefore, allegations of parallel pricing conduct alone are insufficient to plead a Section 1 price fixing claim.

"When allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  In other words, plaintiffs alleging parallel conduct must allege "plus factors" that suggest that the conduct is the product of a preceding agreement.  *Burch*, 662 F.3d at 227 ("Alleging parallel conduct 'is thus much like a naked assertion of conspiracy in a § 1 complaint:  it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.'"); *In re Ins. Brokerage*, 618 F.3d at 323 ("[P]lus factors are, by definition, facts that tend[] to ensure that courts punish concerted action – an actual agreement – instead of the unilateral, independent conduct of competitors.").

The Third Circuit has identified a non-exhaustive list of "plus factors" that tend to demonstrate the existence of an agreement.  *See, e.g.*, *In re Ins. Brokerage*, 618 F.3d at 321-322; *Burch*, 662 F.3d at 227.  These plus factors include "(1) evidence that the defendant had a

18

motive to enter into a price-fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Burtch*, 662 F.3d at 227.

Before considering each factor separately, the Court notes that the first two factors may indicate that "defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Id*. (citing *In re Ins. Brokerage*, 618 F.3d at 322); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004). While "[t]hese two plus factors are important to a court's analysis, because their existence tends to eliminate the possibility of mistaking the workings of a competitive market . . . with interdependent, supracompetitive pricing," these two factors alone may not suffice in establishing that there was an agreement. *In re Flat Glass*, 385 F.3d at 361. "Thus this type of economic evidence is neither necessary nor sufficient to conclude that sufficient proof of an agreement exists . . . but it is relevant and courts should as a general matter consider it." *Id*. at 361 n.12. The most important evidence, however, will generally be evidence of the third factor. *See id*. at 361.

### 1. Motive to Enter Into a Price Fixing Conspiracy

"Evidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." *Id*. In other words, it is "evidence that the structure of the market was such as to make secret price fixing feasible." *Id*. (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002)).

An industry is conducive to collusion where there are "oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. Mar. 4, 2009); *see also In re Blood Reagents*

*Antitrust Litig.*, 756 F. Supp. 2d 623, 631 ("The salient features of the blood reagents market – described in the Complaint as one that is highly concentrated, contains high barriers to entry, has inelastic demand, lacks reasonable substitutes, and is based on a standardized product – are each conducive to transforming that motive into action."); *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is the most realistic in concentrated industries."); *U.S. v. Alcoa, Inc.*, No. 00-954, 2001 WL 1335698, at *12 (D.D.C. June 21, 2001) (describing product homogeneity and inelastic demand as market characteristics conducive to collusion).  Membership in trade associations, "while not enough by itself to confer plausibility on the allegation of conspiracy," is another feature of the market that is suggestive of an inference of an agreement.  *In re Blood Reagents*, 756 F. Supp. 2d at 632.

Here, Direct Purchaser Plaintiffs allege in the Amended Complaint that (1) "DIPF are commodity products, which are produced to industry-wide standards"; (2) the "relevant DIPF markets are highly concentrated," with Defendants making 90 percent of sales in 2008; (3) "effective entry into the relevant DIPF markets takes time and a substantial cash investment" as well as the ability to develop a broad line of products and a distribution network; (4) there is an inelasticity of demand for DIPF due to barriers to entering the market that give sellers greater power as a result; and (5) Defendants all publish price books that list per unit prices as well as multiplier discounts.  Furthermore, Direct Purchaser Plaintiffs allege that Defendants participated in DIFRA, a trade association that facilitated an information exchange amongst Defendants.  In light of these allegations, the Court finds that Direct Purchaser Plaintiffs have adequately pled a motive to enter into a price fixing conspiracy.

2. *Actions Contrary to Defendants' Interests*

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *In re Flat Glass*, 385 F.3d at 360-61. A number of cases suggest that it is against economic self-interest to raise prices during a downturn in product demand. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2011); *In re Chocolate*, 602 F. Supp. 2d at 576-77 ("Allegations that demand is in decline . . . may . . . implicate an agreement when joined with averments of anticompetitive or parallel conduct").

Direct Purchaser Plaintiffs' Amended Complaint alleges that "[d]espite a notable downturn in the United States economy, prices in the United States for DIPF increased 26 percent between 2007 and 2008 and climbed steeply over the course of the conspiracy." (Am. Compl., Docket Entry No. 78 at ¶ 92). Defendants dispute that their actions were against self-interest, arguing that they merely engaged in rational, follow-the-leader pricing. They cite to *In re Ins. Brokerage* for the proposition that "[i]n a highly concentrated market, any single firm's price and output decisions will have a noticeable impact on the market and on its rivals,' such that when any firm in that market 'is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firm.'" 618 F.3d at 321 n.19 (internal quotations omitted). This argument, however, does not address Direct Purchaser Plaintiffs' contention that rising prices during falling demand was against self-interest or behavior that would not have occurred in a competitive market. While Sigma and Star Pipe Products may have acted rationally by increasing prices in the wake of McWane's price increase, Defendants do not address the fact that McWane decided to increase prices in the first place. Thus, the Court

finds Defendants' argument unconvincing and determines that Direct Purchaser Plaintiffs adequately pled facts showing that Defendants acted contrary to their self-interest.

   *3.   Traditional Conspiracy*

   Finally, evidence of a traditional conspiracy is "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Burtch*, 662 F.3d at 227.  As previously explained, "[t]he most important evidence will generally be [such] non-economic evidence that there was an actual, manifest agreement not to compete." *In re Flat Glass*, 385 F.3d at 361.

   In the Amended Complaint, Direct Purchaser Plaintiffs allege that Defendants communicated about their agreement and, through DIFRA, exchanged current market information, which allowed them to detect any loss of market share and, thereby, ensure that no Defendant violated the terms of the agreement.  Finally, Direct Purchaser Plaintiffs point to the FTC's enforcement action and consent decrees to bolster the plausibility of their claims.

   Defendants argue that these allegations are insufficient.  In particular, they argue that Direct Purchaser Plaintiffs' general allegations concerning Defendants' communications with each other are too vague or amount to legal conclusions.  Furthermore, they point out that the specific telephone calls identified by Direct Purchaser Plaintiffs occurred *after* each allegedly coordinated price increase and, therefore, do not evidence a preceding agreement.  They also argue that participation in DIFRA did not further the alleged price fixing scheme because DIFRA merely shared current market information concerning the volume of Defendants' sales.  Exchange of such information, they assert, is less indicative of a conspiracy to fix prices than the

22

exchange of price information.  *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1313 (11th Cir. 2003).  Additionally, they argue that government investigations "are far from sufficient to show a conspiracy to fix prices."  *In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*, No. 09-2002, 2011 WL 3702453, at \*2 (S.D. Cal. Aug. 22, 2011).

The Court is not inclined to agree with Defendants.  First, although a number of Direct Purchaser Plaintiffs' allegations regarding Defendants' communications contain legal conclusions, Direct Purchaser Plaintiffs have identified several specific telephone calls between Defendants as well as another means of communication – a public letter.  Furthermore, participation in information exchanges in highly concentrated markets involving a fungible product with inelastic demand can be indicative of anticompetitive behavior.  *U.S. v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969); *Todd*, 275 F.3d at 212.  While a government investigation alone may be insufficient as a factual enhancement, Direct Purchaser Plaintiffs have provided additional factual allegations that render their claims plausible.

Furthermore, Defendants' argument seeks to dismember the Amended Complaint, isolating each allegation to demonstrate that it is insufficient standing alone.  The proper inquiry, however, is whether the parallel conduct occurred in a context that suggests an agreement was made.  *See Twombly*, 559 U.S. at 557; *In re Blood Reagents*, 756 F. Supp. 2d at 630.  This requires weighing the evidence together to determine if the context is suggestive of an agreement.  Thus, looking at the evidence in sum, the Court is inclined to agree that Direct Purchaser Plaintiffs have alleged a factual enhancement that nudges their claim across the line from conceivable to plausible.

### D.  Count Two

Under Section 2 of the Sherman Act, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . .  to monopolize any part of the trade" is guilty of an offense and subject to penalties.  15 U.S.C. § 2.  A Section 2 violation consists of two elements:  (1) "possession of monopoly power;" and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 186 (3d Cir. 2005) ("*Dentsply I*") (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992)).  Defendants challenge Direct Purchaser Plaintiffs' pleading based on both elements. (Docket Entry No. 96, Attach. 1 at 28).

#### 1.  Possession of Monopoly Power

Monopoly power is "the power to control prices or exclude competition" within a relevant market.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "More precisely, it is the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable."  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (internal quotations omitted).  Monopoly power may be "inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."  *Id*. at 381 (citing *U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)).  "Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, or the alleged monopolist's dominant share of that market, and of high barriers to entry."  *Id*. (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *Graco, Inc. v. PMC Global, Inc.*, No. 08-1304, 2012 WL 762448, at *8 (D.N.J. Mar. 6,

2012) ("One indirectly proves market power by (1) defining the relevant market, (2) establishing that the defendant has a large share of that market, and (3) showing that there are barriers to entry which protect the defendant's large market share.").

a.Relevant Market

"The first step in determining whether a § 2 violation has occurred is to define the relevant market." *Desai v. Impacta, S.A.*, No. Civ. 89-4817, 1990 WL 132709, at *5 (D.N.J. Sept. 7, 1990). The relevant market contains two dimensions: (1) the product market; and (2) the geographic market. *Id*. Defendants challenge only Direct Purchaser Plaintiffs' definition of the product market.

The product market is the "the group of products with which the defendant's products effectively compete . . . ." *Id*. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.v. U.S.*, 370 U.S. 294, 325 (1962). "[W]ithin this broad market, well-defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes." *Id*. "The boundaries of such a submarket may be determined by examining such practical indicia as industry of public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct consumers, distinct prices, sensitivity to price changes and specialized vendors." *Id*.

"[T]he determination of a relevant product market or submarket . . . is a highly factual one best allocated to the trier of fact." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992); *Todd*, 275 F.3d at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *Found. for Interior Design Educ. Research v. Savannah Coll. of Art &*

*Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that [the market definition] elements of the antitrust claim be pled with specificity."); *Graco*, 2012 WL 762448, at *8 ("Whether the plaintiff has properly defined the relevant market is an issue for the fact finder."); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. Apr. 18, 2012).

Only "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *U.S. Horticultural Supply v. Scotts Co.*, 367 Fed. Appx. 305, 309 (3d Cir. 2010) (citing *Queen City Pizza*, 124 F.3d at 436). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put . . . ." *Queen City Pizza*, 124 F.3d at 436. "[W]hile there may be some degree of preference for the one over the other, either would work effectively." *Id.* at 437. "Whether [products] are interchangeable is analyzed from the customers' perspective." *Graco*, 2012 WL 762448, at *8. "The relevant product market is also defined by cross-elasticity of demand, whether the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.*; *Crestron Elecs., Inc. v. Cyber Sound & Sec. Inc.*, No. , 2012 WL 426282, at *4 (D.N.J. Feb. 9, 2012) (citing *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)).

Direct Purchaser Plaintiffs allege that the product market is "DIPF that is produced in the United States."[4] ("Domestic DIPF Market").  (Am. Compl., Docket Entry No. 78 at ¶¶ 3, 143). Defendants challenge Direct Purchaser Plaintiffs' contention that there is a separate DIPF market specifically for *domestic* DIPF.  (Docket Entry No. 96, Attach. 1 at 29).  Defendants argue that Direct Purchaser Plaintiffs concede in the Amended Complaint that "DIPF are commodity products, which are produced to industry-wide standards" that govern both domestic and imported DIPF."  (*Id*. (citing Am. Compl., Docket Entry No. 78 at ¶ 101)).  They argue that this interchangeability of the product belies their contention that there is a separate market for domestic DIPF.  Furthermore, Defendants urge the Court to take judicial notice of the U.S. International Trade Commission's determination that "Chinese and U.S. [DIPF] are basically interchangeable, since all are made to the same [American Waste Water Association] specifications."  (*Id*. at 29-30 (citing Certain Ductile Iron Waterworks Fittings From China, Inv. No. TA-421-4 USITC Pub. 3657 (Exhibit A), at page V-6 (December 2003))).

Direct Purchaser Plaintiffs do not deny that imported and domestic DIPF are technically interchangeable (i.e. pipe systems that use domestic DIPF function with imported DIPF as well). (Docket Entry No. 102 at 25-29).  Instead, they argue that passage of the ARRA, which allocated more than $6 billion to fund water infrastructure construction projects using domestically produced material, essentially created a domestic DIPF market.  In other words, by specifying that the funds were only to be spent on domestically produced products, the ARRA eliminated imported DIPF as a substitute for domestic DIPF for a large number of water infrastructure construction projects.  Direct Purchaser Plaintiffs contend that the domestic DIPF market, therefore, bears a "rational relation to the methodology courts prescribe to define a market for

---

[4] For the purposes of this opinion, this market is referred to as the "domestic DIPF market," and DIPF produced in the domestic market is referred to as "domestic DIPF."

antitrust purposes – analysis of the interchangeability of use of the cross-elasticity of demand" – and is plausible.  *Todd*, 275 F.3d at 200.

The Court agrees.  The Court cannot say that Direct Purchaser Plaintiffs' allegation that the ARRA effectively left consumers of DIPF without a substitute, thus creating a domestic DIPF market, is not plausible.  This is particularly so where, as here, the ARRA publicly recognizes the domestic DIPF market as a separate entity and has created a group of distinct, federally-funded customers.  In essence, the ARRA's "Buy American" provision created exactly the kind of market pressures that permit anticompetitive efforts to succeed.  For example, an agreement amongst domestic sellers enables them to engage in anticompetitive behavior to keep prices artificially high, knowing that the "Buy American" provision of the ARRA will protect them from the resulting decrease in demand that would normally accompany a price increase in a competitive market.  Therefore, the Court concludes that Defendants' arguments are more appropriately made at the summary judgment stage of the litigation, and Direct Purchaser Plaintiffs have adequately pled that the relevant market is the domestic DIPF market.

### b. Dominant Share of Market

"A predominant share of the market . . . may suffice to demonstrate monopoly power." *Fineman*, 980 F.2d at 201-02; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Market power may be inferred from a predominant share of the market."). Here, Direct Purchaser Plaintiffs allege that McWane possessed at least 90% of the domestic DIPF market at all relevant times.  Courts have held comparable amounts sufficient.  *Eastman Kodak*, 504 U.S. at 481 ("Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is . . . sufficient to survive summary judgment . . . ."); *Am. Tobacco Co. v. United States*, 328 U.S. 781,

28

797 (1946) ("over two-thirds of the entire domestic field of cigarettes and over 80% of the field

of comparable cigarettes" constituted a "substantial monopoly"); *U.S. v. Grinnell Corp.*, 384

U.S. 563, 571 (1966) ("87% of the accredited central station service business leaves no doubt

that the congeries of these defendants have monopoly power . . . .").

 Defendants argue that a predominant market share is insufficient where, as here, the

market share declined rapidly.  The Amended Complaint states that McWane's 100 percent

market share decreased to 90 percent as a result of Star Pipe Product's entry into the market.

While "declining market share may reflect an absence of market power, . . . it does not foreclose

a finding of such power."  *Oahu Gas Serv., Inc. v. Pacific Res., Inc.*, 838 F.2d 360, 366-67

(1977) (citing *Greyhound Computer Corp., Inc. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488 at 496

n.18 (9th Cir. 1977) (citations omitted)).  For example, in *Oahu Gas*, a decrease in the

defendant's market share from 100 percent to 68.2 percent did not foreclose a conclusion that the

defendant possessed monopoly power.  *Id*. at 366.  Therefore, the Court finds that the decline in

Defendants' market share from 100 percent to 90 percent does not foreclose a conclusion that

Direct Purchaser Plaintiffs have adequately pled monopoly power.

c. Barriers to Entry

 "In evaluating market power, it is not market share that counts, but the ability to *maintain*

market share."  *U.S. v. Dentsply Int'l., Inc.*, 399 F.3d 181, 188-89 (3d Cir. 2005) ("*Dentsply I*")

(citing *United States v. Syufy Enters.*, 903 F.2d 659, 665-55 (9th Cir. 1990)).  Therefore, while

market power may be the "most significant factor" in assessing monopoly power, it is not

exclusive.  *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 329 (D.N.J. Jan. 28,

1999) (citing *Barr Labs., Inc. v. Abbot Labs.*, 978 F.2d 98, 112 (1992)); *Crossroads*

*Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998)

("Alleging market share alone is not sufficient to state a claim under the Sherman Act. Monopolization . . . requires something more . . . ."). Other relevant factors include "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods o[r] services from outside the market, and consumer demand factors." *Fineman*, 980 F.2d at 202; *Barr Labs.*, 978 F.2d at 112.

Proof of barriers to entry is required to indirectly prove market power because "[a] dominant market share may not equate to market power if there are new market entrants waiting in the wings to compete for that market share." *Graco*, 2012 WL 762448, at *10. A barrier to entry is a cost that a new entrant must incur that was not incurred by the incumbent. *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 114 F.3d 206, 214 (D.C. Cir. 1997); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993). "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

Defendants argue that Star Pipe Products' entry into the domestic DIPF market despite the alleged distributor agreement and exclusive dealing and rebate policies demonstrates that McWane lacked the ability to exclude competition from the market. In other words, Defendants argue that Star Pipe Products' entry into the market demonstrates a lack of barriers to entry. In *Oahu Gas*, however, the entry of two competitors into a market previously controlled by the defendant did not preclude a finding that high barriers to entry existed in the market, even where the entry into the market resulted in a decrease in the defendant's market share from 100 percent to 68.2 percent. 838 F.3d at 366-67. Therefore, the entry of Star Pipe Products into the domestic DIPF market does not preclude a conclusion that McWane possessed monopoly power.

Defendants also contend that the barriers to entry listed in the Amended Complaint –

"time and substantial cash" and the development of a "reputation for quality" and a sufficient

product line as barriers to entry – are not legally significant barriers to entry.  To the contrary,

Direct Purchaser Plaintiffs also allege, however, that entry into the domestic DIPF market

"requires a new entrant to develop an appropriate distribution network and a reputation for

quality and service with waterworks distributors and end-users."  (Am. Compl., Docket Entry

No. 78 at ¶ 75).  "The existence of a dominant and difficult to duplicate distribution networks

may be a barrier to entry and indicate market power."  *Graco*, 2012 WL 762448, at *10;

*Fineman*, 980 F.2d at 203.  Therefore, the Court finds that Direct Purchaser Plaintiffs'

allegations that entry into the market is impeded by the need to build a distribution network in

the face of McWane's rebate policies and exclusive dealing contracts are sufficient at the

pleading stage to show barriers to entry.

### 2.  *Maintenance of Monopoly Power*

Finally, Defendants challenge the second element of a Section 2 claim – maintenance of

monopoly power as distinguished from growth or development as a consequence of a superior

product, business acumen, or historic accident.[5]  Unlawful maintenance of a monopoly occurs

when the "defendant has engaged in anti-competitive conduct that reasonably appears to be a

significant contribution to maintaining monopoly power."

Direct Purchaser Plaintiffs allege that McWane performed two unlawful acts to maintain

its monopoly status.  First, Direct Purchaser Plaintiffs allege that McWane entered into an

exclusive distribution agreement with Sigma, under which Sigma agreed not to compete with

---

[5] Defendants' arguments concerning exclusive dealing policies appear under the heading
"McWane Did Not Possess Monopoly Power in the 'Domestic Fittings Market.'"  (Docket Entry
No. 96, Attach. 1 at 32).  Despite this heading, the Court interprets these arguments as a
challenge to the second element of a monopolization claim.

McWane by refraining from entering the market to supply its own domestic DIPF and, instead, distributed McWane's domestic DIPF.  Second, Direct Purchaser Plaintiffs allege that McWane adopted exclusionary practices to restrain Star Pipe Products' ability to effectively compete in the domestic DIPF market.  Specifically, Direct Purchaser Plaintiffs allege that (1) "McWane threatened waterworks distributors with delayed or diminished access to McWane's [d]omestic DIPF, and the loss of accrued rebates on the purchase of McWane's [d]omestic DIPF, if those distributors purchased [d]omestic DIPF from [Star Pipe Products];" (2) Sigma agreed to implement a similar distribution policy; (3) "McWane threatened some waterworks distributors with the loss of rebates in other product categories, such as ductile iron pipe, waterworks valves, and hydrants, if those distributors purchased [d]omestic DIPF from [Star Pipe Products];" (4) "McWane bundles rebates for pipes and DIPF to compel purchasers to buy DIPF from McWane, rather than from [Star Pipe Products], in order to be eligible for substantial rebates on other pipe products;" and (5) McWane changed its rebate structure for [d]omestic DIPF to require waterworks distributors to make high percentages of their total [d]omestic DIPF purchases from McWane to be eligible for rebates.  (Am. Compl., Docket Entry No. 78 at ¶ 85).

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).  The case law is clear that exclusive dealing agreements may constitute an unlawful maintenance of monopoly power, particularly when "used by a monopolist to strengthen its position" and "ultimately harm competition."  *See ZF Meritor*, 696 F.3d at 270; *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011).  Thus, "[b]ehavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."  *Dentsply I*, 399 F.3d at 187.

At the same time, "[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270 (citing *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010)). For example, for buyers, exclusive dealing arrangements "may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand." *Id.* (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 306 (1949). For the seller, "an exclusive dealing arrangement with customers may reduce expenses, provide protection against price fluctuations, and offer the possibility of a predictable market." *Id.* Thus, exclusive dealing arrangements are not *per se* uncompetitive.

To be anticompetitive, exclusive dealing arrangements must "foreclose competition in a substantial share of the line of commerce affected." *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Defendants argue that Star Pipe Products' entry into the domestic DIPF market precludes Direct Purchaser Plaintiffs from demonstrating foreclosure of competition. The test, however, "is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply I*, 399 F.3d at 191. Therefore, Star Pipe Products' entry into the market does not preclude a conclusion that McWane unlawfully maintained its monopoly status. Furthermore, none of the cases cited by Defendants to support the proposition that Star Pipe Products' entry into the market precludes a finding of barriers to entry was decided at the motion to dismiss stage. *See Omega Envt'l v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998); *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818 (6th Cir. 1982); *Advanced Health-Care Servs.*

33

*Inc. v. Giles Memorial Hosp.*, 846 F. Supp. 488 (W.D. Va. 1994).  The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.  Therefore, Direct Purchaser Plaintiffs have adequately pled the second element of a Section 2 actual monopolization claim.

E.   *Counts Three & Four*

Defendants next argue that dismissal of Counts Three and Four is necessary because the agreement between McWane and Sigma was a legitimate buy-sell relationship that did not actually exclude Sigma as a competitor in the domestic DIPF market.  (Docket Entry No. 96, Attach. 1 at 43-47).  The Court is not persuaded by this argument.  Direct Purchaser Plaintiffs allege that Sigma took steps to enter the domestic DIPF market that include "(i) formulating a complete or nearly complete operational plan, (ii) arranging for an infusion of equity capital to fund domestic production, (iii) obtaining approval of its Board of Directors for its domestic entry plans, and (iv) casting prototype product."  (Am. Compl., Docket Entry No. 78 at ¶ 76).  Although Defendants argue that Sigma lacked sufficient capital to actually develop a broad line of DIPF products and, therefore, was merely exploring the possibility of entering the domestic DIPF market, the cases cited by Defendants were decided either at summary judgment or after trial.  As such, Direct Purchaser Plaintiffs' allegations are sufficient to show that McWane excluded Sigma from entering the domestic DIPF market.  *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, Civ. No. 09-60637, 2010 WL 773581, at *2 (S.D. Fla. Mar. 5, 2010).

F.   *Count Three*

As discussed above, Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . .  to

monopolize any part of the trade" is guilty of an offense and subject to penalties.  15 U.S.C. § 2.

To plead a conspiracy to monopolize, a plaintiff must allege: "(1) an agreement to monopolize;

(2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a

causal connection between the conspiracy and the injury alleged."  *Howard Hess Dental Labs.*

*Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) ("*Dentsply II*").

Defendants argue that dismissal of Count Three is necessary as Direct Purchaser

Plaintiffs have not adequately alleged that Defendants acted with specific intent to maintain

monopoly power.  (Docket Entry No. 96, Attach. 1 at 40-42).  Specific intent is "an intent which

goes beyond the mere intent to do the act."  *Dentsply II*, 602 F.3d at 253 (citing *Aspen Skiing Co.*

*v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985)).  "In other words, the defendant

must have intended to achieve an illegal monopoly."  *Id.* (internal quotations omitted).  Specific

intent may be inferred from the defendants' unlawful conduct.  *Id.*

Defendants argue that dismissal is required under *Dentsply II*.  In that case, allegations

that the defendants "have acted with the specific intent to unlawfully maintain a monopoly" and

that "the intended effect of the exclusive dealing arrangement . . . has been the elimination of any

and all competition" were insufficient to plead specific intent.  *Id.* at 257.  The Court concluded

that these allegations, even when coupled with the assertion that defendants "knew that this

exclusive dealing arrangement was and is an illegal restraint of trade designed to maintain

Dentsply's monopoly," were insufficient because the iterations were too conclusory.  *Id.* at 257-

58.  The plaintiffs had not "stated enough factual matter to suggest some coordination among the

[other defendants], something to suggest that they knew that Dentsply was spearheading an effort

to squash its competitors by pressing the [other defendants] into its service and keeping prices

artificially high."  *Id.* at 258.  The Third Circuit concluded that the pleadings were insufficient to

show that the defendants intended to advance the monopoly and, instead, may have been acting merely out of self-interest in cooperating with the monopolist's plan by signing a bilateral dealing agreement with the monopolist. *Id.* The only plausible inference from such conduct, the court concluded, is that the other defendants each sought to acquire, retain or increase their own business, an act not prohibited by antitrust laws.

*Dentsply II* is distinguishable from the present case, however, because that case involved a network of dealers who had allegedly conspired with the monopolist to exclude the manufacturer's rivals from the market. *Id.* at 244. The monopolist in that case had imposed exclusive dealing contracts for many years, and the court concluded that the dealers were coerced into going along with the exclusive dealing agreements in order to maintain access to the products. *Howard Hess Labs. Inc. v. Dentsply Int'l Inc.*, 516 F. Supp. 2d 324, 328 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010). Therefore, "[b]ased on plaintiffs' own allegations, it is at least as likely that the [dealer] defendants simply chose to make the best of a bad situation in order to have access to the Dentsply [product] line." *Id.* at 342 (internal quotations omitted).

The same cannot be said in this case. Direct Purchaser Plaintiffs have pled that McWane and Sigma entered into an agreement whereby Sigma would act as a distributor for McWane rather than enter the market and abide by certain price agreements in an attempt to exclude Star Pipe Products from the market. Unlike in *Dentsply II*, there is no evidence that Sigma was merely making the best of a bad situation or that the scheme was necessary for Sigma to maintain access to McWane products. To the contrary, Sigma considered entering into the manufacturing business itself and, according to Direct Purchaser Plaintiffs, only chose not to do so after McWane provided certain financial inducements to enter into the alleged scheme. Thus,

the Court finds that Direct Purchaser Plaintiffs have adequately pled specific intent and dismissal of Count Three is, therefore, not warranted.

V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss are denied.  An appropriate order will follow.

<u>*/s/ Anne E. Thompson*</u>
ANNE E. THOMPSON, U.S.D.J.

Date: March 5, 2013