NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In RE Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation | Civ. No. 12-711<br><br>OPINION |

THOMPSON, U.S.D.J.

## I. INTRODUCTION

This matter has come before the Court upon three motions to dismiss. Defendant Star Pipe Products, Ltd. ("Star Pipe Products") filed a motion to dismiss Count One of the Second Consolidated Amended Complaint ("SCAC"). (Docket Entry No. 201). Defendant Sigma Corporation ("Sigma") filed a motion to dismiss Counts Three and Four of the SCAC. (Docket Entry No. 202). Defendant McWane, Inc. ("McWane") filed a motion to dismiss the new portions of the SCAC that relate to alleged June 2010 and March 2011 price increases. (Docket. Entry No. 204). Plaintiffs City and County of Denver ("Denver"), Coastal Plumbing Supply Company, Inc. ("Coastal"), GCO, Inc. ("GCO"), Hi Line Supply Co., Ltd. ("Hi Line"), John Hoadley and Sons, Inc. ("Hoadley"), Mountain States Supply, LLC ("Mountain States"), Mountainland Supply, LLC ("Mountainland"), and Public Works Supply Co., Inc. ("Public Works"), (collectively, "Direct Purchaser Plaintiffs"), oppose the motions. (Docket Entry Nos. 219, 220). The Court has decided these matters upon consideration of the parties' written

submissions and oral arguments. For the reasons given below, each Defendant's motion to dismiss is denied.

## II. BACKGROUND

This case concerns antitrust violations allegedly committed by manufacturers and distributors of ductile iron pipe fittings ("DIPF"). Ductile iron pipes are made of a ferrous material that makes them particularly strong and durable. (SCAC, Docket Entry No. 186 at ¶ 1). As a result, ductile iron pipes are well-suited for use in high-pressurized water systems and have become the industry standard for water and wastewater systems. (*Id*. at ¶¶ 1, 40). Ductile iron pipes are joined together using DIPF. (*Id*. at ¶¶ 2, 41). There is no widely-used substitute for DIPF. (*Id*. at ¶¶ 41, 48).

DIPF, which are produced in a variety of configurations of sizes, shapes, and coatings, are either manufactured domestically or imported. (*Id*. at ¶¶ 42, 44). Defendants sell imported DIPF and made approximately 90 percent of DIPF sales in 2008. (*Id*. at ¶¶ 44, 48). McWane also sells domestic DIPF and "was the only producer of a full line of [d]omestic DIPF," controlling nearly 100 percent of the domestic DIPF market. (*Id*. at ¶ 87).

Defendants sell DIPF directly to independent wholesale distributors ("waterworks distributors"), which specialize in distributing products for water infrastructure projects and are the primary channel of DIPF to end users. (*Id*. at ¶ 43). Defendants also sell DIPF directly to municipal and regional water authorities. (*Id*.).

At the time of the events giving rise to Direct Purchaser Plaintiffs' allegations, DIPF pricing information was publicly available in two ways. First, "Defendants all published . . . price books listing per-unit prices for each DIPF item carried by a given supplier." (*Id*. at ¶ 119).

Second, "Defendants periodically published uniform multiplier discounts at which they offered to sell DIPF." (*Id*.).

   A. *Price Fixing Conspiracy*

Direct Purchaser Plaintiffs allege that from "at least as early as January 2008 and continuing at least until March 2011, Defendants agreed and conspired to fix, raise, maintain and stabilize, and did in fact fix, raise, maintain and stabilize, the prices at which DIPF (imported and domestic) were sold in the United States." (*Id*. at ¶ 49). Defendants wanted to increase their prices in 2008 and communicated with each other frequently and in private regarding DIPF prices, output, and increases in prices. (*Id*. at ¶ 51). Through these conversations, Defendants "arranged and agreed upon a system by which they would all accomplish price increases through the use of seemingly unilaterally announced price increases." (*Id*.). Defendants agreed that "if one of them announced a price increase on DIPF, then the other Defendants would subsequently announce a similar increase in their prices." (*Id*.).

   1. *January 2008 Price Increase*

McWane sought to increase its prices in January 2008. (*See id*. at ¶¶ 51-56). Despite Defendants' agreement, McWane "was concerned that Sigma and [Star Pipe Products] would not adhere to McWane's announced price increases" and that McWane would suffer lost sales as a result. (*Id*. at ¶ 52). Consequently, "McWane agreed to implement higher prices only if Sigma and [Star Pipe Products] changed their business methods to reduce the risk that their local sales personnel would sell DIPF at lower-than-published prices." (*Id*. at ¶ 54). McWane communicated to Sigma and Star Pipe Products the terms of its plan to restrain price competition, and they, in turn, "communicated their understanding and acceptance of McWane's

offer . . . by publicly taking steps to limit their discounting from published price levels . . . ." (*Id*. at ¶ 55).

Following this new agreement, McWane publicly announced on January 11, 2008 that it was increasing prices. (*Id*. at ¶ 53). Sigma and Star Pipe Products announced "similar" price increases "[s]oon thereafter." (*Id*.). McWane and Sigma executives discussed their efforts to implement the January 2008 price increase by phone on or about March 10, 2008. (*Id*.).

    2.   *June 2008 Price Increase*

McWane entered into an agreement with Sigma and Star Pipe Products to raise prices in exchange for information about the volume of Sigma and Star Pipe Products' monthly sales of DIPF. (*Id*. at ¶ 58). The information was exchanged through an entity named the Ductile Iron Fittings Research Association ("DIFRA") that operated from June 2008 until January 2009. (*Id*. at ¶ 58). Through DIFRA, Defendants submitted their previous months' sales to an accounting firm that aggregated and distributed the information to each Defendant. (*Id*.). The data submitted to the accounting firm was typically no older than 45 days, and the reports returned to each defendant contained data typically no more than two months old. (*Id*. at ¶ 64). Sharing this information about recent sales volume enabled Defendants to facilitate price coordination by providing each defendant with the means to monitor its own market share and the output of its rivals. (*Id*. at ¶¶ 63-64).

The terms of McWane's offer to raise prices in exchange for Sigma and Star Pipe Products' participation in DIFRA were communicated in conversations between Defendants and in a public letter sent by McWane to its waterworks distributors. (*Id*. at ¶ 59). According to Direct Purchaser Plaintiffs, a portion of the letter was not relevant to the waterworks distributors and was, instead, intended to inform Sigma and Star Pipe Products of the terms of McWane's

proposed price increases. (*Id*.). To communicate their understanding and acceptance of McWane's offer, Sigma and Star Pipe Products began participating in the DIRFA information exchange in June 2008. (*Id*. at ¶ 60).

On June 17, 2008, McWane publicly announced the second DIPF price increase. (*Id*. at ¶ 57). Sigma and Star Pipe Products announced similar price increases soon after. (*Id*.). McWane and Sigma discussed the implementation of the June price increase by phone on or about August 22, 2008. (*Id*. at ¶ 62).

### 3. April 2009 Price List

In April 2009, McWane announced a new price list for DIPF that was to become effective on May 1, 2009. (*Id*. at ¶ 65). Senior executives of McWane and Star Pipe Products then spoke by phone and Star Pipe Products sought assurances that McWane would implement the announced price list. (*Id*.). After receiving such assurances, Star Pipe Products adopted a similar price list. (*Id*. at ¶¶ 65-66). Sigma also "communicated with McWane and [Star Pipe Products] concerning an arrangement to alleviate McWane's concerns about secret discounting." (*Id*. at ¶ 67).

### 4. June 2010 Price Increase

In the months and weeks leading up to the June 2010 price increase announcements that Defendants issued, senior executives at McWane and Sigma spoke over the telephone on multiple occasions. (*Id*. at ¶ 68).

On June 8, 2010, Sigma drafted a price increase letter to customers. (*Id*. at ¶ 72). This document reflected Sigma's intention to "follow suit when Star or others take a definitive action" on price increases. (*Id*.). Two days later, Sigma sent a letter to customers setting forth the price increases that it would impose effective July 1, 2010, including price increases for non-domestic

DIPF. (*Id*.). On June 17, 2010, McWane communicated to customers that it would be raising prices for non-domestic products, effective July 1, 2010. (*Id*. at ¶ 73).

On the following day, June 18, 2010, Star Pipe Products announced an almost identical price increase for non-domestic products. (*Id*. at ¶ 74). On June 25, 2010, Sigma announced a price increase for non-domestic products, effective July 1, 2010. (*Id*.).

   5.   *March 2011 Price Increase*

On February 15, 2011, McWane announced new list prices and multipliers for both domestic and non-domestic DIPF, effective March 14, 2011. (*Id*. at ¶ 78). McWane also announced time limitations on project pricing (i.e., offering customers discounts from published price levels, typically in the form of lower price multipliers that may be set for an entire project or job, or on a one-time basis). (*Id*.).

Before finalizing its new price increase announcement, Sigma wanted assurance that it would still be able to purchase domestic DIPF from McWane at a discounted price (20% less than McWane's published price) pursuant to a Master Distribution Agreement ("MDA") which the two companies entered into on or about September 17, 2009. (*Id*. at ¶ 79). That agreement provided, among other things, that McWane was to be Sigma's exclusive source for domestic DIPF. (*Id*.). On or about February 16, 2011, McWane provided this assurance. (*Id*.). Mitchell Rona (Sigma's Vice President of Operations) received a call from someone from McWane, who confirmed that, consistent with their previous pricing agreement, Sigma's price for domestic DIPF would be at a specific percentage less or at a specific lower multiplier. (*Id*.). Rona communicated this information to upper management at Sigma. (*Id*.).

On or about February 24, 2011, Star Pipe Products announced price increases identical to McWane's, effective March 14, 2011. (*Id*. at ¶ 81). Star Pipe Products' announcement initially

did not place time limits on project pricing. (*Id*.). The next day, February 25, 2011, Sigma also announced identical price increases to McWane's, effective March 14, 2011, which did include time limits on project pricing. (*Id*. at ¶ 82).

On March 3, 2011, a Sigma representative called and spoke with Star Pipe Products employee Daniel McCutcheon (previously Vice President of Sales and currently President). (*Id*. at ¶ 83). On the following day, March 4, 2011, McCutcheon called and spoke with a Sigma representative. (*Id*.).

Following these calls, on March 8, 2011, Star Pipe Products issued a revised price increase announcement that included time limits on project pricing. (*Id*. at ¶ 84). By that date, all Defendants had issued similar price increase announcements that all contained limitations for how much longer customers could obtain discounting. (*Id*.).

B. *Instant Lawsuit*

Direct Purchaser Plaintiffs filed a Consolidated Amended Complaint ("CAC") on July 11, 2012. (Docket Entry No. 78). The CAC set forth four counts. (*Id*. at ¶¶ 142-174). In Count One, Plaintiffs Denver, Coastal, GCO, Hi Line, Hoadley, Mountain States, Mountainland, and Public Works on behalf of the Price Fixing Class seek treble damages, costs, and attorneys' fees from all Defendants for conspiring to fix, maintain, and stabilize DIPF prices in violation of Section 1 of the Sherman Act. (*Id.* at ¶¶ 142-152). In Count Two, Plaintiffs GCO, Hi Line, Mountain States, and Mountainland on behalf of the Monopolization Class seek treble damages, costs, and attorneys' fees from McWane for monopolizing the domestic DIPF market in violation of Section 2 of the Sherman Act.[1] (*Id.* at ¶¶ 153-160). In Count Three, Plaintiffs GCO, Hi Line,

---

[1] A summary of the allegations underlying Direct Purchaser Plaintiffs' monopolization conspiracy claims is in the Court's March 5, 2013 opinion. (Docket Entry Nos. 115, 116).

Mountain States, and Mountainland on behalf of the McWane/Sigma Conspiracy Class seek treble damages, costs, and attorneys' fees from McWane and Sigma for conspiring to monopolize the domestic DIPF market in violation of Section 2 of the Sherman Act. (*Id.* at ¶¶ 161-167). Finally, in Count Four, Plaintiffs GCO, Hi Line, Mountain States, and Mountainland on behalf of the McWane/Sigma Conspiracy Class seek treble damages, costs, and attorneys' fees against McWane and Sigma for conspiring to unreasonably restrain trade in violation of Section 1 of the Sherman Act. (*Id.* at ¶¶ 168-174). Direct Purchaser Plaintiffs contend that, as a result of Defendants' unlawful conduct, they were "injured in their business and property" and were "forced to pay higher prices for DIPF than they otherwise would have paid in the absence of Defendants' conspiracy." (*Id.*).

On September 26, 2012, Defendants filed motions to dismiss the CAC. (Docket Entry Nos. 96, 96). The Court denied Defendants' motions to dismiss on March 5, 2013. (Docket Entry Nos. 116, 117). On February 10, 2014, Direct Purchaser Plaintiffs filed the SCAC. (Docket Entry No. 186). The principal substantive additions to the SCAC are changes to the definition of the Price Fixing Class and the temporal scope of the price fixing conspiracy. (*Id.* at 7, 17, 68-84, 123(a), 135, 148, 165, 172).

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of

showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id*. (quoting *Iqbal*, 556 U.S. at 675). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). But, the court should disregard any conclusory allegations proffered in the complaint. *Id*. Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679). This requires more than a mere allegation of an entitlement to relief. *Id*. "A complaint has to 'show' such an entitlement with its facts." *Id*. A claim is only plausible if the facts pled allow a court to reasonably infer that the defendant is liable for the misconduct alleged. *Id*. at 210 (quoting *Iqbal*, 556 U.S. at 678). Facts suggesting the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

## IV. ANALYSIS

A. *Star Pipe Products' motion to dismiss Count One of the SCAC*

Star Pipe Products seeks dismissal of Count One of the SCAC because "the documents referred to and relied upon by Direct Plaintiffs . . . regarding 2010 and 2011 conduct are not accurately summarized." (Docket Entry No. 201, Star Pipe Products' Br. at 2). In support of its motion to dismiss, Star Pipe Products has submitted six documents. (*Id*.). In its brief, Star Pipe

Products analyzes the documents and provides an explanation for why each document does not support an inference of conspiracy using factual assertions that are extraneous to the complaint. (*Id.*). In their opposition papers, Direct Purchaser Plaintiffs also reference facts that are extraneous to the complaint. (Docket Entry No. 220, Defs.' Br. at 31).

These arguments are not warranted at this juncture in the proceedings. In ruling on a motion to dismiss, the Court may not weigh evidence or otherwise decide which version of the facts is true. *See*, *e.g.*, *Acevedo v. Monsignor Donovan High Sch.*, 420 F.Supp.2d 337, 342 (D.N.J.2006) (noting that arguments that merely attack the factual accuracy of a plaintiff's allegations are "improper arguments to support a motion to dismiss under Rule 12(b)(6)."); *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir.2001) (observing that on a motion to dismiss "[w]e must accept as true all factual allegations in the complaint").

For these reasons, the parties' opposing factual arguments with respect to Count One will not be weighed at his juncture in the proceeding and Star Pipe Products' motion to dismiss will be denied. (Docket Entry No. 201).

B. *Sigma's motion to dismiss Counts Three and Four of the SCAC*

Sigma seeks dismissal of Counts Three and Four of the SCAC. (Docket Entry No. 202). As discussed above, the Court previously denied Defendants' motion to dismiss Counts Three and Four of the CAC. (Docket Entry Nos. 96, 96). The facts underlying the Court's March 5, 2013 opinion upholding Counts Three and Four are identical to those alleged in the SCAC. (Docket Entry Nos. 159, Ex. B).

Sigma's justification for bringing a second motion to dismiss is the result of a parallel FTC proceeding. On January 4, 2012, the FTC filed two complaints against defendants asserting, among other things, counts for conspiracy and monopoly. (Docket Entry No. 186 at ¶

108). That same day, Sigma entered a consent decree with the FTC in which it did not admit to any wrongdoing, but agreed not to engage in certain conduct in the future. (*Id*. at ¶ 112). The case against McWane continued. (*Id*. at ¶ 112). On May 8, 2013, an Administrative Law Judge ("ALJ") issued a 464-page Initial Decision. (*Id*. at ¶ 113). The ALJ found that the MDA was an agreement in restraint of trade and a conspiracy to monopolize the domestic DIPF market. (Docket Entry No. 202, Sigma's Br., at 9). Both McWane and Complaint Counsel appealed the ALJ's decision to the FTC. (*Id*.).

The FTC issued its final opinion and order on January 30, 2014. (*Id*.). It dismissed five of the six remaining counts against McWane, including all counts involving Sigma. (*Id*.). Specifically, the FTC unanimously dismissed the counts alleging that the MDA was an unreasonable restraint of trade and alleging that Sigma conspired with McWane to allow the latter to monopolize the domestic DIPF market. (*Id*.). The FTC further determined that none of the provisions of the MDA had any adverse anticompetitive effects on the domestic DIPF market. (*Id*.).

The results of the FTC proceedings are not binding on this court. Moreover, the FTC reached its decision after extensive discovery. Here, the parties have not yet had the opportunity to conduct discovery and, at this stage in the proceedings, the Court must accept as true all of Direct Purchaser Plaintiffs' well-pleaded factual allegations and construe the complaint in the light most favorable to Direct Purchaser Plaintiffs. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). *See also Redick v. E Mortg. Mgmt., LLC*, C.A. No. 11-1260, 2013 WL 5461616, at *2 (D. Del. Sept. 30, 2013) (a court "may not make findings of facts based on [another judicial proceeding] without converting the motion to dismiss into a motion for

summary judgment."). Therefore, for the reasons previously set forth in the Court's March 5, 2013 opinion, the Court will deny Sigma's motion to dismiss. (Docket Entry Nos. 116, 117).

C. *McWane's partial motion to dismiss the new portions of the SCAC relating to alleged June 2010 and March 2011 price increases*

McWane seeks dismissal of the new portions of the SCAC relating to allegations that McWane, Sigma, and Star Pipe Products engaged in a parallel price move in June 2010 and March 2011. (Docket Entry No. 186 at ¶¶ 68-84). Star Pipe Products joins McWane in this motion.

Defendants argue that Direct Purchaser Plaintiffs failed to plead facts suggesting Defendants entered into an agreement to fix prices. (Docket Entry No. 226 at 3). Specifically, Defendants contend that Direct Purchaser Plaintiffs failed to allege anything other than lawful, follow-the-leader pricing. (*Id*.).

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. "The first element – a contract, combination, or conspiracy – requires 'some form of concerted action,' which we define as 'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme.'" *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).

To plead such a meeting of the minds, a mere "allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs alleging parallel conduct must also allege "plus factors" that suggest that the conduct is the product of a preceding agreement. *Burtch*, 662 F.3d at 227; *In re Ins. Brokerage*,

618 F.3d at 323 ("[P]lus factors are, by definition, facts that tend[] to ensure that courts punish concerted action – an actual agreement – instead of the unilateral, independent conduct of competitors.").

The Third Circuit has identified a non-exhaustive list of "plus factors" that tend to demonstrate the existence of an agreement. *See, e.g.*, *In re Ins. Brokerage*, 618 F.3d at 321-322; *Burtch*, 662 F.3d at 227. These plus factors include "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Burtch*, 662 F.3d at 227. The Court examines each plus factor below.

  1. *Motive to Enter Into a Price Fixing Conspiracy*

"Evidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." *Id*. In other words, it is "evidence that the structure of the market was such as to make secret price fixing feasible." *Id*. (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002)).

An industry is conducive to collusion where there are "oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. Mar. 4, 2009). *See also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 631; *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001). Membership in trade associations, "while not enough by itself to confer plausibility on the allegation of conspiracy," is another feature of the market that is suggestive of an inference of an agreement. *In re Blood Reagents*, 756 F. Supp. 2d at 632.

Here, Direct Purchaser Plaintiffs allege in the SCAC that (1) "DIPF are commodity products, which are produced to industry-wide standards"; (2) the "relevant DIPF markets are highly concentrated;" (3) "effective entry into the relevant DIPF markets takes time and a substantial cash investment" as well as the ability to develop a broad line of products and a distribution network; (4) there is an inelasticity of demand for DIPF due to barriers to entering the market that give sellers greater power as a result; and (5) Defendants all publish price books that list per unit prices as well as multiplier discounts.  Furthermore, Direct Purchaser Plaintiffs allege that Defendants participated in DIFRA, a trade association that facilitated an information exchange amongst Defendants.  In light of these allegations, the Court finds that Direct Purchaser Plaintiffs have adequately pled a motive to enter into a price fixing conspiracy.

  2.  *Actions Contrary to Defendants' Interests*

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."  *In re Flat Glass*, 385 F.3d at 360-61.  A number of cases suggest that it is against economic self-interest to raise prices during a downturn in product demand.  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2011); *In re Chocolate*, 602 F. Supp. 2d at 576-77.

Here, Direct Purchaser Plaintiffs' SCAC alleges that "[d]espite a notable downturn in the United States economy, prices in the United States for DIPF increased 26 percent between 2007 and 2008 and climbed steeply over the course of the conspiracy." (Docket Entry No. 186 at ¶ 106).  Defendants dispute that their actions were against self-interest, arguing that they merely engaged in rational, follow-the-leader pricing.  While Sigma and Star Pipe Products may have acted rationally by increasing prices in the wake of McWane's price increase, Defendants do not address the fact that McWane decided to increase prices in the first place.  Thus, the Court

determines that Direct Purchaser Plaintiffs adequately pled facts showing that Defendants acted contrary to their self-interest.

### 3. Traditional Conspiracy

Evidence of a traditional conspiracy is "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Burtch*, 662 F.3d at 227.

With respect to the June 2010 price fixing allegations, Direct Purchaser Plaintiffs allege that Defendants conspired by communicating with each other over the telephone and by public letters. (Docket Entry No. 186 at ¶¶ 68-70). Direct Purchaser Plaintiffs allege Defendants conspired, with respect to their parallel March 2011 price increase announcements, by communicating with each other by telephone. (Docket Entry Nos. at ¶¶ 80-81).

Defendants argue that Direct Purchaser Plaintiffs' allegations of conspiratorial communication are "vague and unpersuasive." The Court disagrees. Direct Purchaser Plaintiffs have identified several specific communications between Defendants. (Docket Entry No. 186 at ¶¶ 68-70). Furthermore, participation in information exchanges in highly concentrated markets involving a fungible product with inelastic demand can be indicative of anticompetitive behavior. *U.S. v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969); *Todd*, 275 F.3d at 212.

Thus, Direct Purchaser Plaintiffs have adequately pled facts suggesting that McWane, Sigma, and Star Pipe Products engaged in parallel price moves in June 2010 and March 2011. For the reasons set forth above, McWane's motion to dismiss will be denied.

V.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss will be denied.  An appropriate order will follow.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

Date: 8/13/14